**DLC MANAGEMENT CORP.,
Plaintiff–Appellant,**

**Arnold L. Cohen, Frederick Cohen
and Carole Horowitz, Plaintiffs–
Appellants–Cross Appellees,**

**v.**

**TOWN OF HYDE PARK, The Town of
Hyde Park (N.Y.) Town Board of the
Town of Hyde Park and Planning Board
of Hyde Park, Defendants–Appellees–
Cross Appellants,**

**Nancy Alden and Evelyn Crispell,
Defendants.**

**Docket Nos. 97–7932, 97–7934 and 97–9004.**

United States Court of Appeals,
Second Circuit.

Argued March 31, 1998.

Decided Dec. 15, 1998.

Robert Hermann, Plunkett & Jaffe, P.C., White Plains, N.Y., for Plaintiffs–Appellants–Cross Appellees.

Edward Rubin, of Counsel, New York, NY, for Plaintiff–Appellant.

S. Pitkin Marshall, New York, NY, Brian S. Sokoloff, Thurm & Heller, New York, NY, On the Brief, for Defendants–Appellees–Cross–Appellants.

Before: PARKER, Circuit Judge, EGINTON,* and GLASSER,** Senior District Judges.***

EGINTON, Senior District Judge:

Plaintiffs DLC Management ("DLC"), Arnold Cohen, Frederick Cohen, and Carole Horowitz (the "Landowner Plaintiffs") appeal from a decision of the United States District Court for the Southern District of New York (Charles L. Brieant, *Judge*) granting summary judgment in favor of defendants Town of Hyde Park, the Town Board of Hyde Park, and the Planning Board of Hyde Park (collectively "the Town") as to plaintiffs' 42 U.S.C. § 1983 substantive due process claim. Specifically, plaintiffs seek review of the district court's finding that plaintiffs lacked a property interest sufficient to support a substantive due process claim. Plaintiffs also appeal from the district court's denial of their motion for a new trial as to their equal protection claim, asserting that the district court decided that motion by applying an incorrect legal standard.

The Town cross-appeals from the district court's denial of its motion for summary judgment as to plaintiff's equal protection claim, as well as from the district court's imposition of $39,905 in discovery sanctions against defendants. We affirm.

## I. BACKGROUND

### A. Factual Background

This dispute focuses on the zoning status of one of two parcels of land which the Landowner Plaintiffs contracted on May 16, 1989 to sell to DLC for $3.25 million. The sale agreement was conditioned on the property being zoned "in the manner necessary for [DLC's] intended use as a shopping center of not less than 150,000 square feet of rentable area." At the time of the sale agreement's execution, however, the parcels had a Tourist Business zoning classification which prohibited commercial development other than tourist-oriented retail businesses such as gift shops, antique shops, and arts and crafts boutiques.[1] Hyde Park Town Code ("Town Code") § 108–22(D)(7).

On November 24, 1989, the Town enacted Local Law 4, which among other things, changed the status of one of the two parcels under contract to DLC from a Tourist Business to a Planned Business zoning classification. Under the Planned Business zoning classification, the building of a shopping center was permitted upon environmental review, Town approval of a site plan application, and the Zoning Board of Appeals's issuance of a Special Permit. Town Code § 108–21(E)(6). The Town contends that the 1989 rezoning was procedurally and substantively flawed, and that it was initiated for the personal benefit of Basil Raucci, the then-Chairperson of the Zone Line Revision Committee (the "ZLRC").

DLC began the land use approval process in January, 1990 by submitting a site plan application to the Town. In March of that

---

* The Honorable Warren W. Eginton, of the United States District Court for the District of Connecticut, sitting by designation.

** The Honorable I. Leo Glasser, of the United States District Court for the Eastern District of New York, sitting by designation.

*** Chief Judge Ralph K. Winter certified a Judicial Emergency Pursuant to 28 U.S.C. § 46(b) permitting the panel to include two district judges and one circuit judge.

1. The parcels are located within 160 acres of the Roosevelt Historic Site, former home of President Franklin D. Roosevelt.

year, DLC supplemented its site plan application with an environmental assessment form, seeking approval for a 199,000 square foot shopping center to be named Playhouse Square. Four months later, the Town issued a "positive declaration" and began its environmental review of DLC's proposal.[2]

In 1992, Grand Union and Wal–Mart agreed to become Playhouse Square's anchor tenants, and as a result of these tenants' need for additional space, DLC sought Town approval for an extra 24,000 square feet. At the Town's request, DLC submitted the new site plan application and environmental assessment form for a proposed 223,000 square foot shopping center. DLC also submitted a preliminary Draft Environmental Impact Statement ("DEIS"). See N.Y. Envtl. Conserv. Law § § 8–0105, 8–0109.

Seeking assurances that the Town would ultimately approve Playhouse Square, representatives of DLC and Wal–Mart attended meetings with Town Supervisor Nancy Alden. DLC claims that Alden expressed her support for Playhouse Square. The Town contends that Alden was interested, but noncommittal. Meanwhile, Walter Crispell, owner and operator of a Hyde Park hardware store and husband of Planning Board Chairperson Evelyn Crispell, expressed to the media and at a public meeting his opposition to the shopping center's development. In spite of this probable conflict of interest, Chairperson Crispell declined to recuse herself from the review of the Playhouse Square project. DLC alleges that Walter Crispell, a longtime social friend of Alden, also met privately with Alden in attempts to pressure her into changing her position with respect to Playhouse Square.

Thereafter, DLC began to face some formidable challenges to its Playhouse Square proposal. For instance, in February, 1993, the Town required DLC to submit another DEIS after DLC requested an additional 30,000 square foot expansion. Apparently exceeding its authority, the Planning Board required DLC to include in this DEIS a study of the probable economic impact of Playhouse Square on local businesses, and retained an economist to assess the study's accuracy. After the DEIS had been finally accepted as complete, the Town required DLC to provide a Supplemental Environmental Impact Statement to correct alleged defects in the DEIS. At another point, Supervisor Alden raised a proposal at an illegally-called Town Meeting for a moratorium on new buildings along Route 9, where Playhouse Square was to be located.[3] Alden also began to publicly voice her opposition to the Playhouse Square project.

Finally, on July 12, 1993, the Town adopted Local Law 8. Local Law 8 repealed as illegal some, but not all, of the Town's 1989 zoning enacted by Local Law 4. Among the very few parcels Local Law 8 affected was the property upon which Playhouse Square was to be built. As a consequence of Local Law 8, the Playhouse Square property lost its Planned Business zoning classification, and reverted to the more restrictive Tourist Business classification. Seeking to invalidate Local Law 8, plaintiffs initiated a C.P.L.R. Article 78 proceeding before the Supreme Court of the State of New York, Dutchess County. The state court struck down Local Law 8, holding that the Town had failed to obey State environmental requirements before amending its zoning laws. It is undisputed that at the time the Town passed Local Law 8, the Landowner Plaintiffs remained the owners of the land, and DLC was the contract-vendee of the property.

As a result of Local Law 8, Wal–Mart and Grand Union canceled their contracts for Playhouse Square. Plaintiffs claim that they spent over $1 million on the Playhouse

---

**2.** Under the State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law, art. 8, a "positive declaration" is a finding by the lead agency having jurisdiction by law to approve an action that a proposed action has at least one adverse environmental impact about which a draft environmental impact statement must be prepared. See N.Y. Envtl. Conserv. Law § 8–0105–8–0113; 6 N.Y. Comp.Codes R. & Regs. § § 617.2 (Definitions).

**3.** The Town Meeting was held without notice, in violation of the Open Meetings Law, McKinney's Public Officers Law § 100 et seq., which requires public notice any time a quorum of board members gathers to discuss public business.

Square Project, but admit that nothing was ever built on the property.

### B. The Proceedings Below

Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 on October 14, 1993, claiming that the Town, Alden, and Crispell had violated their constitutional rights to procedural due process, substantive due process, and equal protection. Discovery, which was overseen by Magistrate Judge Mark D. Fox, was contentious and protracted, and culminated in $39,905 in sanctions against defendants for the late production of certain documents.

Defendants moved for summary judgment on December 8, 1993, claiming that Local Law 8 had been enacted in order to correct certain "blatantly illegal zoning" of 1989. On August 30, 1994, the district court denied defendants' motion for summary judgment, finding that there were disputed issues of material fact as to whether Local Law 8 was intended to correct the alleged illegalities surrounding the passage of Local Law 4 or to avoid competition which would result from the building of Playhouse Square. In a September, 1995 pretrial conference, the court dismissed the action with prejudice as to Crispell.

Defendants renewed their motion for summary judgment on September 28, 1995. Defendants argued with respect to the due process claim that plaintiffs had no constitutionally-protected property interest. As to plaintiffs' equal protection claim, defendants asserted that plaintiffs had failed to show that other similarly-situated properties were treated differently than their property. Alden asserted the defenses of qualified and legislative immunity. In a Memorandum and Order dated April 2, 1996, Judge Brieant granted defendant's motion for summary judgment as to the substantive and procedural due process claims, but denied the motion as to the equal protection claim. Judge Brieant also dismissed the action as to Alden on the basis of her legislative immunity.

The equal protection claim proceeded to trial in February 1997. After hearing five weeks of evidence, the jury returned a verdict in favor of defendants. Plaintiffs thereafter moved for a new trial pursuant to Fed. R.Civ.P. 59. That motion was denied by Judge Brieant in open court at a hearing on April 17, 1997. On June 26, 1997, Judge Brieant adopted Magistrate Judge Fox's recommendation that plaintiffs be awarded $39,905 in discovery sanctions for what the district court characterized as defendants' "Fabian response to discovery" and "nonchalant attitude about conscientious compliance."

## II. DISCUSSION

### A. Substantive Due Process

Plaintiffs assert that the district court erred when it granted summary judgment in favor of defendants as to plaintiffs' substantive due process claim. Specifically, plaintiffs urge us to find that they had a property interest, cognizable under the substantive due process doctrine, in the Planned Business zoning classification of their land. Plaintiffs alternatively argue that they had a property interest sufficient to support a due process claim because they had a legitimate claim of entitlement to the ultimate approval of Playhouse Square. We reject both of plaintiffs' theories and conclude that plaintiffs lacked a property interest sufficient to support a substantive due process claim.

■ We review the district court's grant of summary judgment *de novo. See, e.g., Lazard Freres & Co. v. Protective Life Insur. Co.*, 108 F.3d 1531, 1535 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997). Summary judgment is appropriate when there is no issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In examining this question, the court must resolve all factual inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 1. The Zoning

■ Whether a landowner and/or a contract-vendee of a parcel of land has a substantive due process right to the existing zoning of that land is a question of first

impression for this court. Solely for the purposes of this opinion, we will assume without determining the issue that any property rights the Landowner Plaintiffs may have had with respect to the land were shared with DLC, the contract-vendee.

As with any case in which a landowner claims that it was deprived of a property right in violation of the substantive due process doctrine, we must begin our analysis "by determining whether a constitutionally cognizable property interest is at stake." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). In this regard, a property right will not be recognized as cognizable under the due process doctrine if the person claiming the right has a mere abstract need or desire for, or unilateral expectation of the claimed right. Rather, the person claiming the right must have a "legitimate claim of entitlement" to it. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Given that the substantive component of the Due Process Clause derives not from the language of the Constitution, but from "the accumulated product of judicial interpretation of the Fifth and Fourteenth Amendments," we approach this analysis, as we must, with caution and restraint. *Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 226, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)(quoting *Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 543–44, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (White, J., dissenting)).

In land use regulation cases, including zoning cases, this Court is committed to applying a strict "entitlement test" when determining whether an alleged property right is sufficient to support a substantive due process claim. *See RRI Realty v. Incorporated Village of Southampton,* 870 F.2d 911, 918 (2d Cir.1989); *Brady v. Town of Colchester,* 863 F.2d 205, 213–14 (2d Cir.1988). This test, first articulated in *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 58 (2d Cir.1985), applies not only to a property interest in what is sought, but also to a property interest in what is owned. *See Zahra v. Town of Southold,* 48 F.3d 674, 680 (2d Cir.1995) (dic-

ta); *RRI Realty,* 870 F.2d at 915. In either case, the inquiry is derived from the Supreme Court's analysis in *Roth,* and seeks to determine whether there is a "legitimate claim of entitlement" to the benefit in question. *Zahra* 48 F.3d at 680 (quoting *RRI Realty,* 870 F.2d at 915).

In applying the entitlement test, we look to "existing rules or understandings that stem from an independent source such as state law" to determine whether a claimed property right rises to the level of a right entitled to protection under the substantive due process doctrine. *Brady,* 863 F.2d at 212 (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. 2701). Accordingly, we must look in the instant case to New York zoning law to ascertain whether plaintiffs had a legitimate claim of entitlement to the Planned Business zoning classification of their land. *See Id.* at 212. We conclude that they did not.

New York zoning law appears to take into account the somewhat intuitive concept that "a property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Under New York law, a property owner has no right to the existing zoning status of his land unless his right has become "vested." *See, e.g., In the Matter of Ellington Constr. Corp. v. Zoning Board of Appeals of the Inc. Village of New Hempstead,* 77 N.Y.2d 114, 122, 566 N.E.2d 128, 132, 564 N.Y.S.2d 1001, 1005 (1990). In order for a right in a particular zoning status to vest, a property owner must have undertaken substantial construction and must have made substantial expenditures prior to the enactment of the more restrictive zoning ordinance. *Id.* "Where ... there has been no construction or other change to the land itself," a property owner has no right to complete a project permitted under an earlier zoning classification. *In the Matter of Pete Drown Inc. v. Town Board of the Town of Ellenburg,* 229 A.D.2d 877, 879, 646 N.Y.S.2d 205, 206 (3d Dep't 1996). In instances in

which construction has been improperly delayed by town officials in an attempt to prevent vesting, the right to an existing zoning status may also vest by equitable estoppel. *See In the Matter of Lawrence School Corp. v. Morris,* 167 A.D.2d 467, 468, 562 N.Y.S.2d 707, 708 (2d Dep't 1990); *In the Matter of Faymor Dev. Co. v. Board of Standards & Appeals of City of New York,* 45 N.Y.2d 560, 566, 383 N.E.2d 100, 103, 410 N.Y.S.2d 798, 801 (1978).

■ Plaintiffs properly do not argue that they had a vested right, by estoppel or otherwise, to the Planned Business zoning classification. Because plaintiffs neither began construction on nor otherwise improved the land, and because plaintiffs do not allege that any delay in construction was caused by an attempt by defendants to prevent vesting, it is clear that plaintiffs' rights had not vested under New York law. In our view, this determination ends the analysis and establishes plaintiffs' lack of a legitimate claim of entitlement to the Planned Business zoning classification. Plaintiffs, however, urge us to adopt the position that vesting should not be the touchstone for determining whether a claimed property right rises to the level of a right protected by the substantive due process doctrine. Plaintiffs contend that land ownership alone is sufficient to establish a substantive due process right in the existing zoning status of the land. We disagree.

We are sympathetic to plaintiffs' plight, and in no way do we sanction or condone the Town's behavior with respect to Playhouse Square. Upon review of the record, it is manifest that plaintiffs were treated shabbily and unfairly. The Due Process Clause does not permit "federal courts [to] become Zoning Boards of Appeals to review nonconstitutional land use determinations by the [C]ircuits' many local legislative and administrative agencies." *Sullivan v. Town of Salem,* 805 F.2d 81, 82 (2d Cir.1986). If we were to adopt plaintiffs' position, any owner of zoned land, which presumably includes the vast majority of landowners, would be entitled to assert a claim in federal court alleging a substantive due process violation each time a local governing body rezoned that land under questionable or unfair circumstances. Keeping in mind the concept that the substantive due process doctrine does not license federal courts to "invalidate legislation which it thinks merely arbitrary or unreasonable," we find plaintiffs' proposition to be untenable. *Ewing,* 474 U.S. at 226, 106 S.Ct. 507. We reach this conclusion not only because plaintiff's position would transform federal courts into zoning boards of appeals, but also because to so broadly define a substantive due process right would contravene the Supreme Court's admonition to delineate such rights only with caution and restraint. *Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 502, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

Plaintiffs argue that this court's decision in *Brady v. Town of Colchester* acknowledges, at least tacitly, a landowner's substantive due process right in the existing zoning status of the land. This is not so. In *Brady,* the plaintiff-landowners claimed that their land had been zoned and used commercially at the time that Colchester town officials re-zoned the property under a more restrictive residential use classification. This court reversed the district court's finding that the Bradys did not have a property right cognizable under the substantive due process doctrine on the basis that there was "a genuine issue of material fact as to how the property was zoned and used" when the rezoning occurred. *Brady,* 863 F.2d at 213. The court opined: "we believe that if in fact the property was zoned and used commercially, appellants very likely would have been entitled to the benefit of the commercial use of their property but for the alleged improper conduct of the appellees." *Id.*

As this court pointed out in *RRI Realty,* 870 F.2d at 917, "*Brady* is an unusual case." This is because of the questions of fact surrounding the zoning classification *and* actual *use* of the land at the time of the rezoning. In our view, had the property been zoned but not used commercially, plaintiffs in *Brady* would not have had a right sufficient to support a substantive due process claim because the use invokes similar common law concepts of vesting. *Brady* is thus distinguishable from the instant case in which it is undisput-

ed that plaintiffs never used the land at all, commercially or otherwise.

Finally, plaintiffs urge us to look by way of analogy to takings law cases which indicate that the right to develop land commercially is part of the "bundle of rights" comprising a property right. *Seawall Assoc. v. City of New York*, 74 N.Y.2d 92, 542 N.E.2d 1059, 1067, 544 N.Y.S.2d 542, 550 (1989). *But see Orange Lake Associates, Inc. v. Kirkpatrick*, 21 F.3d 1214, 1224–25 (2d Cir.1994) (rejecting takings claim because plaintiff lacked a vested interest in the existing zoning of its property). In so arguing, plaintiffs ignore a fundamental difference between the Takings Clause, which permits the taking of private property for public use so long as there is just compensation, and the Due Process Clause, which prohibits the deprivation of life, liberty, or property without due process of law.

In applying takings law, the determination of what is "property" is necessary merely so that a party may be remunerated for what he has lost due to a constitutionally-sanctioned exercise of governmental power. *Seawall Associates*, 74 N.Y.2d at 109–100, 542 N.E.2d at 1068, 544 N.Y.S.2d at 550. In reviewing a substantive due process claim, on the other hand, the ramifications of determining whether a property right is sufficient to support such a claim are much more far-reaching. The latter determination allows a party to invoke the Constitution to completely estop the property infringement of which he complains. *See Walz v. Town of Smithtown*, 46 F.3d 162, 167–68 (2d Cir.1995). Accordingly, while some courts may be inclined to broadly define property for takings law purposes, we are not willing to recognize a substantive due process right for every type of property for which an owner is entitled to just compensation under a takings analysis.

We emphasize that the threshold inquiry in a substantive due process analysis is whether the property interest claimed rises to the level of a property interest cognizable under the substantive Due Process Clause. In that regard, we do not hold today that plaintiffs had no property interest whatsoever in the Planned Business zoning classification. We merely hold that whatever interest

plaintiffs may have had fall short of property rights sufficient to support a substantive due process claim.

## 2. The Approvals and Permits

■ Plaintiffs alternatively argue that questions of fact exist as to whether they had a constitutionally protected property interest in the approvals necessary for the construction of Playhouse Square. Specifically, plaintiffs claim a substantive due process right to the Town's approval of their site plan application and to the Zoning Board of Appeals' (the "ZBA") issuance of a Special Permit. Plaintiffs assert that a question of fact exists regarding whether the Town had the authority to deny site plan approval. Plaintiffs further posit that given the historical tendency of the Town and the ZBA to approve similar applications, Playhouse Square probably would have been approved but for the illegal passage of Local Law 8. We agree with the district court that regardless of whether or not the Town had the authority to deny plaintiffs' site plan application, the ZBA had "wide discretion" to deny the Special Permit that plaintiffs needed. We therefore conclude that plaintiffs lacked a protected property interest in the ultimate approval of Playhouse Square.

■ The threshold inquiry here, as above, is whether plaintiffs possessed a property right in the permits and approvals they sought sufficient to support a substantive due process claim. Under the entitlement test, a constitutionally-protected property interest exists in a sought-after land-use permit or approval if the issuing agency lacked the authority to deny the permit or approval for a legitimate reason, or if the discretion of the issuing agency was so narrowly circumscribed that approval of a proper application was virtually assured. *See RRI Realty*, 870 F.2d at 918. Under this analysis, therefore, a plaintiff may lack a protected property interest in a permit even when the permit was denied arbitrarily. *See Yale Auto Parts*, 758 F.2d at 61. Because the focus of this inquiry is on the degree of the issuing agency's official discretion and not on the probability of its favorable exercise, the question of whether an applicant had a protected proper-

ty interest is normally a matter of law for the court. *See Gagliardi v. Village of Pawling*, 18 F.3d 188, 192 (2d Cir.1994).

In this case, plaintiffs needed, among other things, site plan approval and a Special Permit in order to build Playhouse Square. Plaintiffs argue at length that there are questions of fact as to whether the Town had the discretion to turn down its site plan application. We need not address this contention, however, because as Judge Brieant found, plaintiffs admit that the ZBA "assuredly has discretion as a matter of law to reject an application for a special use permit because of its particular features." Brief of Plaintiffs–Appellants–Cross–Appellees at 38. With respect to the issuance of a Special Permit of the type plaintiffs needed to build Playhouse Square, § 108–95(B) of the Hyde Park Town Code provides in pertinent part:

> General Standards. The Board *may* authorize the issuance of a permit, *provided that all of the following conditions and standards have been met:*
>
> (1) *The location and size of the use*, nature and intensity of the operations involved in it or conducted in connection with it, *the size of the site in relation to it* and the location of the site with respect to the streets giving access to it *are such that it will be in harmony with the appropriate and orderly development of the district* in which it is located and that it complies with all special requirements for such use established in this chapter. (emphasis added).

At the time Local Law 8 was passed, plaintiffs were proposing a 253,000 square foot shopping center—some 54,000 square feet larger than their original proposal. It is clear from the plain language of § 108–95(B) that Playhouse Square's proposed size was a potentially offending feature for which the ZBA had ample discretion to deny a Special Permit. Because we find that the ZBA had the authority not to issue the Special Permit for legitimate reasons, we affirm the district court's holding that plaintiffs lacked a protected property interest in the approvals they needed in order to build Playhouse Square.

**B. *Plaintiffs' Motion for a New Trial***

 After losing at trial on their equal protection claim, plaintiffs moved for a new trial pursuant to Fed.R.Civ.P. 59 on the theory that the jury's verdict was against the weight of the evidence. Judge Brieant denied the motion at a hearing held on April 17, 1997. Plaintiffs assert that the district court improperly applied the Rule 50 standard for judgment as a matter of law in denying their Rule 59 motion. Plaintiffs do not ask us to review the district court's ruling for abuse of discretion. Rather, plaintiffs merely seek a remand to the district court for reconsideration of their Rule 59 motion under the proper standard. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 910 (2d Cir.1997) (holding unavailable appellate review of a district court's ruling on a motion for a new trial as against the weight of the evidence). Although it appears from the record that there may have been some preliminary confusion at the hearing regarding the standards governing a motion for a new trial as against the weight of the evidence, we conclude that the district court applied the proper standard when making its ruling. We thus find a remand to be unnecessary.

 Rule 59(a) of the Federal Rules of Civil Procedure provides: "A new trial may be granted ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." As a general matter, "[a] motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice." *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992) (quotation marks and citation omitted). A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence. *See Byrd v. Blue Ridge Rural Elec. Co-op.*, 356 U.S. 525, 550, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) *See also Dunlap–McCuller v. Riese Organization*, 980 F.2d 153, 157 (2d Cir.1992); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.1992).

 The standards governing a district court's consideration of a Rule 59 motion for a new trial on the grounds that the verdict was against the weight of the evi-

dence differs in two significant ways from the standards governing a Rule 50 motion for judgment as a matter of law. Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. *Song* at 1047. A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is "egregious." *Dunlap–McCuller* at 158. Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility. *Id.*; *Fugazy* at 363.

At the April 17, 1997 hearing, the district court initially stated that the only way it could have granted the motion would have been "to find that the fact finding process indulged in by the last jury was so clearly erroneous as to require a new trial in the interests of justice." Hearing Tr. at 5. The court later considered whether "a reasonable juror had to find that [defendants] wanted to keep out Walmart," and whether "a reasonable juror could have disagreed with [plaintiff's] contentions." Hearing Tr. at 14–15.

The latter portion of the hearing, however, evinces that the district court ultimately applied the correct standard when making its ruling. The court opined:

> [T]he only thing that happened was that [the verdict] came out, in the Judge's view, very unfairly to the persons who were victimized by the town board and deprived of their opportunity to build this shopping center. . . .
>
> I think the Court cannot jump from those facts to a finding that the verdict, total verdict, was against the weight of the evidence. . . .
>
> I don't think that I can hold that the jury verdict was rendered against the weight of the evidence.

Hearing Tr. at 36–37.

Because the district court ultimately applied the correct standard for considering a Rule 59 motion, we find that the earlier statements regarding the reasonable jury standard were harmless references which did not ultimately influence the court's decision. We therefore decline to remand on this issue.[4]

### C. The Discovery Sanctions

Finally, the Town cross-appeals from the district court's June 26, 1997 Order adopting Magistrate Judge Fox's May 23, 1997 recommendation that the court assess the Town $39,905 in discovery sanctions for the late production of certain documents. The Town asserts that the sanctions imposed against it were "procedurally defective" because they were unavailable under Fed.R.Civ.P. 37 or 42 U.S.C. § 1988. The Town also urges us to find that the Magistrate Judge's several Report and Recommendations dealing with the parties' discovery disputes were inconsistent and contradictory, and that their adoption by the district court constituted an abuse of discretion. Lastly, the Town argues that the district court abused its discretion when it adopted the Magistrate Judge's computation of the sanctions amount, which defendants contend was excessive and arrived at erroneously. We disagree with the Town, and find that the district court acted within its discretion.

Because one of the Town's primary defenses was that Local Law 8 was adopted in order to undo the ZLRC's alleged self-dealing and chicanery underlying the adoption of Local Law 4, plaintiffs sought production of all ZLRC documents relating to the 1989 rezoning. During discovery, plaintiffs learned that among the ZLRC's records were several large zoning maps which had been publicly displayed in Town Hall. Plaintiffs also discovered that the ZLRC documents had been stored in a cardboard box with the maps placed on top. Plaintiffs hoped that the ZLRC documents and maps would help refute the Town's claim that it had been hoodwinked into adopting Local Law 4.

The Town initially denied that it had the sought-after ZLRC records. One day after

---

4. This holding renders moot defendants' cross-appeal from the district court's denial of their motion for summary judgment as to their equal protection claim.

the close of discovery, however, the Town produced a box of documents which it claimed contained the ZLRC files. The box actually contained very few of the records plaintiffs had requested, but did contain a previously unproduced Town correspondence favorable to the defense. By an Order dated April 23, 1996, Magistrate Judge Fox authorized additional depositions at the Town's expense in order to explore any issues raised by the newly-produced documents and to seek an explanation for the tardiness of their production. Plaintiffs discovered at these depositions that the box of documents defendants had produced was not the same box which plaintiffs sought.

Plaintiffs thereafter moved for an order precluding the Town from raising at trial its defense that Local Law 8 was passed in order to correct the allegedly tainted 1989 rezoning. In a Report and Recommendation dated November 7, 1996, Magistrate Judge Fox advised the district court not to order the "harsh remedy" of preclusion. The Magistrate Judge instead recommended that the district court instruct the jury that it could draw an adverse inference from the documents' absence.

Thereafter, defendants produced the large zoning maps and another box containing ZLRC records. For the most part, these documents comprised the ZLRC records plaintiffs had sought. This box was found where it had always been—in a Town Hall closet that defendants apparently had never bothered to search. On December 17th and 18th, Magistrate Judge Fox held a hearing in which 22 witnesses were called in order to explain the late production of the ZLRC records and maps.

In a Supplemental Report and Recommendation dated January 3, 1997 ("Supplemental Report"), the Magistrate Judge agreed with plaintiffs that an adverse inference charge was an insufficient sanction for the late production of the ZLRC materials. Magistrate Judge Fox found that defendants had acted in "conscious disregard of their discovery obligations." Supplemental Report at 14. He concluded that the late production of the ZLRC documents required sanctions.

In a Report and Recommendation dated May 23, 1997 ("May Report"), Magistrate Judge Fox considered the parties' objections to the January 3, 1997 Supplemental Report and Recommendation. He reiterated his earlier findings and recommended that the district court sanction defendants in the amount of $39,905. This amount reflected two-thirds of plaintiffs' attorney's fees for pursuing discovery of the ZLRC records and maps, the Magistrate Judge having deducted one-third for certain ambiguities in plaintiffs' attorney's time records. In recommending this award, the Magistrate Judge invoked the court's inherent power to impose sanctions for discovery abuses. He noted: "Seldom has negligence been so gross and sanctionable in the course of document production." May Report at 3.

Defendants filed their objections with the district court. In a Memorandum and Order dated June 26, 1997 ("June Order"), Judge Brieant adopted the Magistrate Judge's suggestions and sanctioned defendants as recommended. With respect to defendants' argument that Magistrate Judge Fox intended the sanctions to cover only plaintiffs' attorney's time spent seeking production of the maps and not the other late-produced ZLRC documents, the district court remarked that there "is a limit to how fine any court can slice the salami," and noted that the late production of the ZLRC records and maps together constituted an "egregious discovery violation." June Order at 3. Judge Brieant also found that the Magistrate Judge's reports, taken together, constituted "a rational judicial effort to speak to the entire problem of the Defendants' discovery and neglect." *Id.*

 We turn first to the Town's contention that the sanctions were "procedurally flawed" because they could not have been granted pursuant to Fed.R.Civ.P. 37, which requires violation of a court's order to produce discovery, or 42 U.S.C. § 1988, which allows an award of attorney's fees only to a prevailing party. This argument overlooks the fact that federal courts have "well-acknowledged inherent power to levy sanctions in response to abusive litigation practices," and that the Magistrate Judge invoked that

power when he made his recommendation to the district court. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

The court's inherent power derives from the sage acknowledgment that courts are "vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (quoting *Anderson v. Dunn,* 19 U.S. (6 Wheat) 204, 227, 5 L.Ed. 242 (1821)). Included in a court's inherent power is the ability to "assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers,* 501 U.S. at 45, 111 S.Ct. 2123 (quotation marks and citation omitted). Moreover, the fact that there may be a statute or rule which provides a mechanism for imposing sanctions of a particular variety for a specific type of abuse does not limit a court's inherent power to fashion sanctions, even in situations similar or identical to those contemplated by the statute or rule. *Id.* at 45–46, 111 S.Ct. 2123.

Because of the potency of the court's inherent power, courts must take pains to exercise restraint and discretion when wielding it. Accordingly, this court has required a finding of bad faith for the imposition of sanctions under the inherent power doctrine. *United States v. International Brotherhood of Teamsters,* 948 F.2d 1338, 1345 (2d Cir.1991). That bad faith must be shown by (1) "clear evidence" or (2) "harrassment or delay or . . . other improper purposes." *Id.* (quotation marks and citation omitted).

In this case, the Magistrate Judge made a finding that defendants had acted in "conscious disregard of their discovery obligations." We deem these findings to be sufficiently concise and based on clear evidence so as to amount to the bad faith required to impose sanctions. Indeed, the record reflects a pattern of behavior which could reasonably be construed as a bad faith effort to thwart plaintiffs' discovery efforts. We thus find that the recommendations of Magistrate Judge Fox, who closely supervised

discovery in this case for nearly three years and who wrote extensively on the matter, were well within his inherent powers. Likewise, we find that the district court acted within its discretion when it adopted the Magistrate Judge's recommendation to sanction the Town. *Cf. Sassower v. Field,* 973 F.2d 75, 80–81 (2d Cir.1992) (upholding sanctions awarded by the district court based on its inherent power to do so).

Defendants next argue that the Magistrate Judge's several Report and Recommendations dealing with the parties' discovery disputes are inconsistent and contradictory, and therefore their adoption by the district court constituted an abuse of discretion. Defendants take the position that the Report and Recommendations are untenable because the Magistrate Judge initially recommended against sanctions and later urged their imposition. Upon review of the record, it is clear to us that as the Magistrate Judge became increasingly aware of the scope of the defendants' discovery abuses, he advocated more severe punishment for that behavior. We thus find the Magistrate Judge's change in position to be a rational and reasonable response to the events as they unfolded before him. Accordingly, we affirm the district court's conclusion that the Report and Recommendations, as a whole, constituted "a rational judicial effort to speak to the entire problem of the Defendants' discovery and neglect."

Finally, we address defendants' contention that the discovery sanctions were meant to cover plaintiffs' attorney's time pursuing the maps only, and not time spent tracking down and ferreting through any other late-produced ZLRC documents. Defendants derive their position from the following passage from the Supplemental Report and Recommendation dated February 3, 1997:

> The late production of the ZLRC maps does require sanctions. I respectfully recommend that all of Plaintiffs' counsels [sic] fees and time spent in pursing that discovery since my April 23, 1996 Order should be charged against the Town.

Supplemental Report at 15.

We find the defendants' position to be flawed for several reasons. First, we find

that the Magistrate Judge referred throughout the Supplemental Report to the "maps" and "ZLRC records" interchangeably. This makes sense, given that the absence of all of these documents gave rise to plaintiff's motion to preclude and were eventually produced together, after the discovery deadline. Second, we find it unlikely that Magistrate Judge Fox misunderstood the import of his own recommendation when he later computed the amount of attorney's fees to be charged to the Town, and included therein the time spend pursuing all of the missing ZLRC documents. Third, we find the above-quoted passage to be somewhat ambiguous because "that discovery" can be construed as referring to all discovery conducted since April 23, 1996, and not solely as a reference to the maps. Accordingly, we are unwilling to find that the district court abused its discretion when it adopted Magistrate Judge Fox's interpretation of his own language over the defendants' interpretation. Because we conclude that defendants read the above-quoted passage too narrowly, out of context, and without respect to the events giving rise to the court's recommendation, we affirm the district court's adoption of the $39,905 in discovery sanctions.

## III. CONCLUSION

For the reasons set forth above, the judgment of the district court is hereby AF-FIRMED.