**TRAVEL CENTER OF FAIRFIELD COUNTY, INC., Plaintiff,**

v.

**ROYAL CRUISE LINE LIMITED, et al., Defendants.**

**No. 3:96CV01025 JBA.**

United States District Court, D. Connecticut.

June 8, 2001.

Philip M. French, Stamford, CT, for Travel Center of Fairfield county, Inc.

Kevin J. O'Connor, Corporation Counsel's Office, West Hartford, CT, Paul D. Williams, Michael A. Bucci, Day, Berry & Howard, Hartford, CT, for Royal Cruise Line Ltd.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

After a jury verdict against it, plaintiff Travel Center seeks post-trial relief under Federal Rules of Civil Procedure 50 and 59, arguing that the evidence at trial supports only one conclusion as to both plaintiff's breach of contract and Connecticut Unfair Trade Practices Act (CUTPA) claim, and in the alternative that error in the jury instructions entitles it to a new trial. For the reasons that follow, the Court concludes that there was ample evidence to support the jury's finding, and that the jury instruction accurately reflected plaintiff's theory of the case. Accordingly, the motions are DENIED.

## FACTUAL BACKGROUND

Plaintiff Travel Center (referred to as "Expo") brought suit against defendant Royal Cruise Line (RCL) to recover for damages it suffered allegedly as a result of RCL's failure to live up to its obligations to Expo concerning three February 1996 cruises. Expo was a small travel marketing company that had entered into a number of successful promotional ventures with RCL over the years, and in August of 1995 RCL forwarded to Expo an agreement committing to run three cruises in February of 1996 aboard the luxury vessel Queen Odyssey, and giving Expo the exclusive right to book all passengers for these cruises, making Expo, in effect, the charterer of all three of these cruises. Expo signed the documents sent by RCL (the "August 1995 Agreement") and returned them to RCL, which admittedly did not sign them until January 1996. Expo's performance under the August 1995 Agreement was secured by a $550,000 Letter of Credit, as it was required to pay RCL $945,000 plus port charges and gratuities for the passenger accommodations on these three cruises. For its efforts, Expo was entitled to all profits over this $945,000 mark.

The evidence at trial showed that both RCL and Expo proceeded under the assumption that Expo was the exclusive marketing agency for berths on these three cruises, with Expo investing substantial sums in radio promotions and other marketing ventures. According to Expo, due to a number of natural disasters along the cruise routes, press coverage of RCL's financial difficulties and low pricing on some of RCL's other cruises, it had difficulty in fully booking the February cruises, and was faced with the possibility of substantial losses. In November of 1995, Patrick Ferrandino (an RCL franchisee who was married to Expo's owner, Luz Ferara) spoke with RCL's Executive Vice President of Sales and Marketing, Spencer Frazier, regarding these difficulties, and the substance of this conversation was hotly disputed at trial. According to Expo, Frazier acknowledged Expo's points as valid, and agreed to abandon the August 1995 Agreement and instead enter into a co-promotion venture where RCL would use its "best efforts" to fill the three February cruises, including sending a "fax blast" to all its sales managers offering bonuses if they booked passengers on these cruises. Frazier, in contrast, testified that the August 1995 Agreements were not discussed, and that instead he agreed with Ferrandino that because Expo had provided substantial business to RCL

in the past, RCL would do something "special" to assist Expo in filling the boats for the February 1996 cruises, thus the "fax blast." He denied any discussions of a "joint venture," and a number of documents introduced at trial suggested that RCL still viewed Expo as the charterer of the February cruises. *See, e.g.,* Ex. 38.

RCL was experiencing financial difficulties, and had sold other ships in its cruise fleet in order to reduce its debt. In mid-January of 1996, RCL announced the sale of the Queen Odyssey to Seabourn, a competing cruise line, and then publicly announced it was closing. The February 1996 cruises were assigned to Seabourn. Ted Sykes, RCL's Chief Financial Officer, testified that in January of 1996 he also became aware that Expo was in serious default under the August 1995 Agreement, and after discussions with Adam Aron, the CEO of RCL's parent company, Norwegian Cruise Lines ("NCL")[1], he decided to call the $550,000 Letter of Credit. The letter of credit proceeds were then transferred as an asset to Seabourn, which operated the February cruises, but did not share the revenues with Expo.

The primary question for the jury was to determine whether the August 1995 charter agreement or the November 1995 "best efforts" agreement constituted the binding contract between the parties. Plaintiff's theory was that the August 1995 Agreement was, at most, an offer by Expo to enter into a contract with RCL, and that when the offer was not accepted by RCL, it was rescinded in November of 1995, and the "best efforts" joint promotion agreement took its place. Under this theory, RCL had no entitlement to the Letter of Credit, but was instead bound to the co-promotion joint venture discussed by Frazier and Ferrandino. Luz Feraro, Expo's President, testified that according

to her understanding of the November 1995 Agreement, Expo was to pay for the passengers it booked on the cruises, and RCL was to sell directly "into" these cruises such that she was not responsible for making up the shortfall, yet Expo would still be entitled to receive all gross receipts in excess of $945,000. Defendant countered in response that the operative agreement was the August 1995 Charter Agreement, that the November discussions were only goodwill gestures on the part of RCL to help Expo make up the shortfall, that Expo was still obligated to pay the charter fee under the August 1995 Agreement, and that when Expo failed to do so it was entitled to call the Letter of Credit. RCL further argued that it assigned the August 1995 Agreement to Seabourn, and that contract law principles permitted it to do so. The jury found that the August 1995 Agreement bound the parties, thus rendering plaintiff's unjust enrichment claim inapplicable, and found against the plaintiff on its CUTPA claim. These motions followed.

### STANDARD

■ In ruling on a motion for judgment as a matter of law under Fed.R.Civ.P. 50, the court is required to:

> consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.

*Tolbert v. Queens College,* 242 F.3d 58, 70 (2d Cir.2001), *quoting Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 367

---

1. NCL was a defendant in this case only as RCL's successor-in-interest.

(2d Cir.1988) (internal quotation marks omitted). In making its evaluation, the court should "review all of the evidence in the record," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), but:

> it must disregard all evidence favorable to the moving party that the jury is not required to believe .... That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Id.* at 551 (internal quotation marks omitted).

■■■■ Plaintiff also moves for a new trial under Rule 59. As a general matter, "[a] motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice." *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (quotation marks and citation omitted). The standards governing a district court's consideration of a Rule 59 motion for a new trial on the grounds that the verdict was against the weight of the evidence differs in two significant ways from the standards governing a Rule 50 motion for judgment as a matter of law. Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence herself, and need not view it in the light most favorable to the verdict winner. A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is "egregious." *See DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 134

(2d Cir.1998) (internal citations omitted). A plaintiff cannot utilize Rule 59 as "a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir.1998).

## Discussion

■■■■ Plaintiff first argues that because no party alleged the existence of the August 1995 Agreement, the only issue for the jury was whether or not the conversation between Ferrandino and Frazier in November of 1995 constituted a "joint venture" agreement that was binding on RCL as a contract. Defendant had pleaded the August 1995 Agreement as its Fifth Special Defense, alleging that "[t]he plaintiff is estopped from denying the existence of the August 9, 1995 agreements," but it withdrew its special defenses during the initial charge conference. Plaintiff now argues that because the August 1995 Agreement was not pleaded by either party, it was not an issue for the trial. Plaintiff has cited no authority for the proposition that a defendant charged with breach of contract must plead the existence of a prior contract in order to maintain a defense based on that contract. Further, from the Court's review of the record and the pleadings, it has been defendant's consistent position over the course of this litigation that the August 1995 Agreement constituted the binding contract between the parties, and thus plaintiff's argument that the failure to plead it renders that contract "moot" rings hollow. RCL's Answer, for instance, admitted that portion of paragraph 11 in plaintiff's Fourth Amended Complaint which alleged that Expo "executed an agreement relating to three sequential cruises ... dated August 9, 1995," but denied the allegations regarding a "new Contract" stemming from the No-

vember 1995 discussions. Answer ¶¶ 7, 10. RCL's Proposed Jury Instructions also make clear its theory that the August 1995 Agreement was valid and governed the relationship between the parties. *See* Doc. 176, Ex. J, No. 9. Even plaintiff's Proposed Charge referenced the choice between the August 1995 Agreement and the November 1995 Agreement.[2] Given the conflicting theories of the parties, it can hardly be said that the question of whether the August 1995 Agreement ever existed was "moot" as plaintiff now contends.

▪ Plaintiff also argues that the jury instructions and verdict form required the jury to choose between the August 1995 Agreement and the November 1995 Agreement, and that instead the jury should have been able to find that even if the August 1995 contract existed, it was later modified or rescinded by the November 1995 "best efforts" agreement. Defendant apparently believed that this was plaintiff's theory of the case, because it requested a charge on modification, to which the plaintiff objected. Doc. # 176, Ex. M. In fact, plaintiff's objection further explained the strategy it would pursue at trial—it objected to a charge that separate consideration was required for a modification because it "improperly assumes one fact—that the plaintiff's 'offer' of the written Agreement on August 9, 1995 could not be withdrawn because Defendants refused to sign ..." and represented that plaintiff would "supply proof that there never was a valid 'Charter Agreement,'" thus making the November contract the original agreement, not a modification. *Id.* at p. 2; *see also,* Joint Trial Memorandum at Tab A

(Plaintiff's Statement of the Case); Tab I at ¶. 4–8 (Plaintiff's Request to Charge).

Plaintiff now claims that it had submitted proposed instructions on the issue, and that it sought to "adopt" defendant's modification charge at some point during the litigation of this case. Expo has not cited to a transcript page to support this claim, nor has it even pointed to any particular day or proceeding in which it claims this action was taken. The Court has reviewed the transcripts for two pre-trial conferences and three separate charge conferences in order to ascertain whether there is any support for this contention, and concludes that there is none. Rather, it is apparent from this review that plaintiff maintained a consistent position: no modification charge was appropriate because the November 1995 Agreement was the only operative contract between the parties. No charge on modification was ever requested by the plaintiff, either verbally or in writing, despite numerous opportunities to do so during the multiple pre-trial and charge conferences that were convened in this case. Plaintiff's post-trial insistence that such a request was made does not square with the reality of the record, or with its stance over the course of this trial.

▪ Even if Expo's version of events— that at some point during the charging conferences it reversed course from its written requests and requested a modification instruction, but was rebuffed by the Court—were born out by the record, such a refusal would not have been error. First, plaintiff did not plead modification in its complaint. While the Court will not

2. Plaintiff's Proposed Charge on the breach of contract count reads, in relevant part:

> Much of the evidence you have heard and seen during this trial relates to the contract between Expo and RCL for their cruises. Was it what is written in the document called "Agreement of August 9,

1995"? Was it the RCL Memorandum of November 30, 1995? was it a hybrid or composite between that Agreement and Memorandum? Was it something still different, defined or partially defined by further oral statements and/or acts?

Doc. # 176, Ex. I at 4.

hold a plaintiff strictly to the allegations of the complaint, there is authority under Connecticut law supporting the proposition that a claim of modification must be pleaded. *See, e.g., Rosick v. Equipment Maintenance and Service, Inc.,* 33 Conn.App. 25, 32, 632 A.2d 1134 (1993) (plaintiff offered evidence of oral modification of contract, but evidence excluded by trial court as irrelevant; Appellate Court affirmed, because "[t]he complaint does not claim an oral modification or waiver of the contract. Since oral modification or waiver is not alleged in the complaint, the issue cannot be tried during the trial."). Expo had four different opportunities to amend the complaint here, yet it never alleged that the August charter agreement had been modified by a subsequent oral agreement. Further, as discussed above plaintiff made its theory of the case very plain over the course of the pre-trial proceedings and the lengthy charge conferences held before the case was submitted to the jury. Given the consistent positions of the parties and their respective legal theories, even had the plaintiff requested such a charge the Court would have been within its discretion in declining to permit it. *See United States v. Russo,* 74 F.3d 1383, 1393 (2d Cir.), *cert. denied,* 519 U.S. 927, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996).

▇▇▇▇ Finally, the evidence at trial did not support a modification charge. "A modification of an agreement must be supported by valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do." *State National Bank v. Dick,* 164 Conn. 523, 529, 325 A.2d 235 (1973). Yet according to the testimony of Ms. Feraro, Expo was bound to do *less* than was contemplated under the original August 1995 Agreement, without risking the letter of credit, while still being entitled to the same remuneration.

As no additional or separate consideration was given, the jury could not have found that the November 1995 Agreement constituted a modification of the original contract, even had it been instructed on the principles plaintiff now claims were essential to its case.

▇▇▇▇ In contrast to its failure to request a charge on modification, Expo did submit a supplemental request for an instruction on commercial frustration, *see* Doc. # 206, but the Court did not err in refusing to instruct the jury on this doctrine. "The doctrine of frustration of purpose ... excuses a promisor in certain situations where the objectives of the contract have been utterly defeated by circumstances arising after the formation of the agreement." *Hess v. Dumouchel Paper Co.,* 154 Conn. 343, 350, 225 A.2d 797 (1966). Hence, frustration is a form of rescission, or a means of excusing a promisor from performance under the terms of the contract, and a defense to the enforcement of a contract. *See Wooldridge v. Exxon Corp.,* 39 Conn.Supp. 190, 473 A.2d 1254 (1984); *see also United States v. General Douglas MacArthur Senior Village,* 508 F.2d 377, 381 (2d Cir.1974). Rescission as a defense must be specially pleaded in Connecticut, *see Mainolfi v. Brazee,* 135 Conn. 435, 437, 65 A.2d 261 (1949), and plaintiff's complaint makes no mention of the concept. As defendant points out, plaintiff did not seek to be excused from the performance of any existing contract; rather, it sought to enforce the terms of the purported November 1995 Agreement, which presumably it was not seeking to rescind. At the second charge conference, plaintiff reiterated that it did not believe the August agreement was the governing contract, but it still sought a frustration charge because if the jury concluded that the August agreement governed, it was the plaintiff's position that that contract was

frustrated. The Court did not allow plaintiff such a last-minute change in litigation strategy, however, as plaintiff did not seek to be excused from performance, and had not pleaded rescission in its Complaint. The concept was simply inapplicable to this case, and despite plaintiff's post-trial attempts to change its characterization of the facts and its legal theories, Expo has not shown that it was error to refuse such a charge.

■ Even if rescission had been part of Expo's case, however, the Court's refusal to give the frustration of purpose charge was correct, as the jury could not have returned a verdict in plaintiff's favor on this theory. As noted above, frustration of purpose requires that the parties' objectives in making the contract be "utterly defeated" by supervening events. The sale of the Queen Odyssey to Seabourn does not meet this criteria: the ships sailed, the cruises took place, and passengers were booked. "Disappointment at the level of income produced is a far cry from an utter defeat of a party's objectives." *Wooldridge,* 39 Conn.Supp. at 194, 473 A.2d 1254. In its brief, Expo argues that its principle purpose was "clearly to promote an RCL cruise for the benefit of its owner and her RCL franchisee husband" and that that purpose was frustrated by the sale of the Queen and the closure of RCL. This objective was not shared by both parties to the contract, however, as Mr. Ferrandino's status as an RCL franchisee and the potential conflicts it presented was a matter of some controversy. *See* Comment to Restatement (2d) of Contracts, § 265, pg. 334–35 ("it is not enough that [the party seeking recission due to frustration of purpose] had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that as *both* parties understand, without it the transaction would make little sense.") (emphasis added).

■ Nor was a charge on the covenant of good faith and fair dealing warranted in this case, despite plaintiff's contention to the contrary. The Connecticut Supreme Court has recognized that such a covenant is implied in every contract. *See Magnan v. Anaconda Industries,* 193 Conn. 558, 479 A.2d 781 (1984). Despite being given four opportunities to refine the allegations in its complaint, however, Expo never pleaded a claim for breach of this covenant, and its Fourth Amended and Substituted Complaint contains no reference to it. *See Proteus Books v. Cherry Lane Music Company,* 873 F.2d 502, 513 (2d Cir. 1989) (not error to refuse to charge the jury on claim that was not pleaded in answer to the complaint). While plaintiff is correct that the Connecticut Supreme Court's decision in *Magnan* does not mention an express requirement that the claim be pleaded as a separate count, in that case the plaintiff had brought his breach of covenant claim as the second count in a two-count complaint. *See* 193 Conn. at 558, 479 A.2d 781. Given that four iterations of the complaint have been filed in this case, the Court does not think it overly onerous to require that plaintiff include all its relevant substantive claims in the final version, instead of confronting the defendant with a new theory of liability at trial, after the opportunity for discovery has passed.

■ Finally, plaintiff contends that the CUTPA charge was erroneous, because it prevented the jury from considering anything beyond the August 1995 Agreement, but the text of the charge itself belies this claim. The jury was instructed *both* on the "cigarette rule" criteria to be considered under CUTPA, including the caveat that "[a] simple breach of contract cannot be a CUTPA violation," *and* the standard for finding a deceptive act, the latter charge given over defendant's objection.

**290**

*See* Jury Instructions at p. 26–27. The Court can find no limitation in its charge that the jury was not to consider conduct outside of the August 1995 Agreement.

■ The Court similarly rejects plaintiff's contention that the conduct in this case so clearly violated CUTPA that the verdict to the contrary demonstrates the jury "clearly did not reasonably comprehend the import of the trial proofs." There was sufficient evidence on plaintiff's CUTPA claim to reach the jury, and the Court denied defendant's Rule 50 motion in this regard. The jury weighed the evidence, assessed the credibility of witnesses, and concluded that RCL's conduct was neither deceptive nor unfair. The Court will not overturn this finding after trial, even though the trial evidence suggested a flavor of unfairness in RCL's dealings with plaintiff. Plaintiff argued to the jury the exact claims that it presses now: that Sykes' conduct in calling the line of credit when he knew that RCL planned to sell the Queen and close its business was unconscionable; that calling the line of credit guaranteeing an abandoned agreement constituted theft; and that the parties' conduct demonstrated that the August 1995 Agreement was not a binding contract between the parties. The jury, however, found to the contrary. It concluded that the August 1995 Agreement, rather than the November 1995 oral agreement, governed the relationship between Expo and RCL, and thus it concluded that RCL was entitled to call the Letter of Credit, as it was undisputed that Expo had not made the $945,000 in payments required under that contract. The jury was entitled to credit Sykes' and Frazier's testimony in this regard.

RCL tried this case under a theory that Expo was bound by the August 1995 Agreement to pay $945,000 for the February cruises; when fulfilling its obligations became difficult, RCL sought to help, but was finally forced to call the Letter of Credit when it encountered financial difficulties. The jury apparently accepted this view of the evidence, and while the Court would not have set aside the verdict had it come out the other way, it cannot be said that the jury reached a "seriously erroneous result." *DLC Management,* 163 F.3d at 133. Witness credibility was essential to the jury's determination in this case, as it was required to ascertain the intent of the parties and what really transpired during the crucial November 1995 conversation between Frazier and Ferrandino. Although the Court is not required on a Rule 59 motion to view the evidence in the light most favorable to RCL, it will not disturb the jury's evaluation of the credibility of Ferrandino, Ferrero, Sykes, Frazier, and other witnesses. *Id.* at 134. No new trial is required.

### Conclusion

For the reasons discussed above, plaintiff's motion for judgment as a matter of law or a new trial (Doc. #217) is DENIED.

IT IS SO ORDERED.