**Shirleyanne FUNK, Plaintiff,**

v.

**F & K SUPPLY, INC., Fowler & Keith Supply Co., Fowler & Keith Supply Co., Inc., and Steve Aaron, Defendants.**

**Linda Michetti, Plaintiff,**

v.

**F & K Supply, Inc., Fowler & Keith Supply Co., Fowler & Keith Supply Co., Inc., and Steve Aaron, Defendants.**

**Nos. 95–CV–637, 95–CV–1065.**

United States District Court, N.D. New York.

March 9, 1999.

206

Office of Jerold Slate, Poughkeepsie, NY (Jerold S. Slate, of counsel), for plaintiffs.

L'Abbate, Balkan, Colavita & Contini, L.L.P., Garden City, NY (Mercedes Colwin, of counsel), for defendants.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

Pending before the Court are plaintiffs' and defendants' post-trial motions in this sex discrimination case. Defendants move for judgment as a matter of law pursuant to FED.R.CIV.P. 50(b), or, alternatively, a new trial pursuant to FED.R.CIV.P. 59(a). Plaintiffs oppose defendants' motion, and move in their own right for attorneys' fees, expenses and costs.

For the reasons that follow, defendants' motion is granted in part and denied in part, and plaintiffs' motion is granted as modified herein.

## I. BACKGROUND

Plaintiffs Shirleyanne Funk and Linda Michetti are former employees of defendant F & K Supply, Inc. ("F & K Supply")[1], a building supply business located in Kingston, New York. Each plaintiff alleges that while she was employed at F & K Supply, F & K's president and sole shareholder, defendant Steven Aaron ("Aaron"), sexually harassed her. After quitting F & K Supply, each brought a lawsuit in 1995, which the magistrate

1. Fowler and Keith Supply Co. and Fowler and Keith Supply Co. Inc., both of which are named as defendants in this action, apparently are trade names for F & K Supply, and not separate entities. *See* Trial Transcript at 311–15.

judge consolidated. Each Complaint presented claims against F & K Supply and Aaron under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York State Human Rights Law ("HRL"), codified at N.Y.Exec.L. § 290 *et seq.*, for hostile work environment sexual harassment and sex-based constructive discharge. Additionally, each Complaint pressed a common-law claim against Aaron for intentional infliction of emotional distress ("IIED").

A jury trial on plaintiffs' claims was held between April 13, 1998 and April 21, 1998 in Albany, New York. At the close of plaintiffs' proof, the court granted defendants' Rule 50(a) motion seeking dismissal of plaintiffs' claims against Aaron under Title VII. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995). On April 21, 1998, the jury returned its verdict in favor of each plaintiff on the remaining Title VII, HRL and IIED claims. As compensatory damages, the jury awarded as follows: $885,000 to Funk, representing $850,000 for emotional pain and anguish and $35,000 for lost wages and benefits; and $465,000 to Michetti, representing $450,000 for emotional pain and anguish and $15,000 for lost wages and benefits. The jury also concluded that both Funk and Michetti were entitled to punitive damages against defendants. A punitive damage hearing was held in Albany, New York on June 6 and 7, 1998. The jury awarded each plaintiff the amounts of $50,000 and $1 against Aaron and F & K Supply, respectively.

Now before the Court are each sides' post-trial motions.

## II. DISCUSSION

### A. Defendants' Post–Trial motion

Defendants move for judgment as a matter of law pursuant to FED.R.CIV.P. 50(b), or, alternatively, a new trial pursuant to FED.R.CIV.P. 59(a).

With regard to their motion for judgment as a matter of law pursuant to Rule 50(b), defendants assert that they are entitled to dismissal of the following: (1) Michetti's claim under Title VII because she did not file a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"); (2) Funk's and Michetti's claims under Title VII and the HRL because neither proved at trial that Aaron's conduct was sex-based; (3) Funk's and Michetti's claims of IIED because (i) an IIED claim is not cognizable in connection with claims under Title VII or the HRL; (ii) neither plaintiff sufficiently pleaded an IIED claim; (iii) neither plaintiff proved an IIED claim at trial; and (4) Michetti's claim of IIED because it is barred by the statute of limitations.

Alternatively, defendants seek, pursuant to Rule 59(a), a new trial on the grounds that: (1) plaintiffs improperly introduced evidence of insurance at trial; (2) the verdict sheet was defective; and (3) the jury's damage awards are grossly excessive.

### 1. The Standard under Rule 50(b)

The Second Circuit has established the standard for granting judgment as a matter of law. The court in *Mattivi v. South African Marine Corp.*, 618 F.2d 163 (2d Cir.1980), stated that:

> The trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Id.,* at 167–68; *see also Luciano v. Olsten Corp.,* 110 F.3d 210, 214 (2d Cir.1997); *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 14 (2d Cir.1993); *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688–89 (2d Cir.1983).[2] Rule 50 of the Federal Rules of Civil Procedure governs the procedure for granting judgment as a matter of law by motion made before the jury retires pursuant to Rule 50(a), or motion after the jury has spoken pursuant to Rule 50(b). FED.R.CIV.P. 50; *see also Samuels,* 992 F.2d at 14.

### 2. Title VII

#### (i) Did Michetti satisfy the EEOC filing requirements?

■ Defendants first contend that because Michetti did not file a timely administrative charge of discrimination with the EEOC, her claim under Title VII, along with her state law claims (i.e., her HRL and IIED claims), which rely upon supplemental jurisdiction, must be dismissed as a matter of law.

■ It is well established that Title VII requires a claimant who desires to bring a suit in federal court to file a charge of discrimination with the EEOC within 180 days "after the alleged unlawful employment practice occurred," or within 300 days of the alleged discrimination if the claimant "has initially instituted proceedings with a State or local agency with authority to grant or seek relief . . . or to institute criminal proceedings." 42 U.S.C. § 2000e–5(e)(1). Generally, a failure to file a timely charge with the EEOC requires dismissal of the Title VII claim as time-barred. *See, e.g., Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). However, this timely-filing requirement is not a jurisdictional prerequisite to suit in federal court, but rather, a requirement that functions like ·a statute of limitations. *Id.; Karen Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996). Thus, it is subject to waiver, estoppel, and equitable tolling. *Zipes,* 455 U.S. at 393, 102 S.Ct. 1127; *Quinn v. Green Tree Credit Corp.,* 159 F.3d ·759, 765 (2d Cir.1998).

In the present case, Michetti filed a charge with the EEOC on April 26, 1995. Her charge alleged discriminatory conduct by defendants, the most recent of which occurred on June 4, 1994. Thus, her administrative charge was filed more than 300 days [3] after the last alleged unlawful employment practice.

Nonetheless, Michetti's claim under Title VII is not time-barred for two independent reasons. First, as the statutory timely-filing requirement with the EEOC functions as a statute of limitations, see *Quinn,* 159 F.3d at 765, it follows that the defense is waived if not set forth in the responsive pleading. *See* FED.R.CIV.P. 8(c); *Zipes,* 455 U.S. at 393, 102 S.Ct. 1127 ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.") (emphasis added); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 751–52 (2d Cir.1992) ("A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, it is waived if not raised in the answer to the complaint.");

---

**2.** While the 1991 amendments to Rule 50 abandoned the terms "directed verdict" and "judgment not withstanding the verdict" in favor of the encompassing "judgment as a matter of law" terminology, the standard for granting the motions was not altered. *See* FED.R.CIV.P. 50 Advisory Committee's note, 1991 Amendment.

**3.** Defendants have assumed that the 300–day period governs. However, it is unclear whether Michetti filed a charge with a New York State or local agency before filing her charge with the EEOC so as to render the 300–day period applicable. *See* 42 U.S.C. § 2000e–5(e); *Karen Van Zant,* 80 F.3d at 712 n. 1. Although I note the issue, it is of no consequence here because Michetti's filing with the EEOC is late even under the longer 300–day period.

see also discussion *infra* at II(A)(4)(ii) and cases cited therein. As defendants did not affirmatively plead that Michetti failed to file a timely administrative charge with the EEOC, they have waived this defense.

 Second, assuming *arguendo* that defendants have not waived the defense, the single filing (or piggybacking) rule excuses Michetti's failure to make a timely EEOC filing. The single filing rule, adopted by the Second Circuit in *Snell v. Suffolk County*, 782 F.2d 1094, 1100–01 (2d Cir.1986), allows, under certain circumstances, a non-filing or untimely-filing plaintiff to join the lawsuit of one who has filed a timely charge with the EEOC. As explained by this Circuit in *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1056–58 (2d Cir.1990), *cert. denied*, 499 U.S. 983, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991), the standard to apply "for determining whether an administrative charge suffices to permit piggybacking by a subsequent plaintiff" depends on the size of the work unit. Under the "broader" test, which applies "[w]here the grievances arise in a work unit of modest size, ... mere similarity of the grievances within the same general time frame suffices to permit the 'single filing rule.'" *Id.* at 1058. "However, where the grievances are alleged to arise throughout a large group," a narrower test applies requiring the administrative claim give notice that the discrimination "affects a group of individuals defined broadly enough to include those who seek to piggyback on the claim." *Id.* The single filing rule makes sense because the function of administrative exhaustion—encouraging settlement through conciliation and voluntary compliance—is satisfied in such circumstances. *Tolliver*, 918 F.2d at 1058 ("If it is impossible to reach a settlement with one discriminatee, what reason would there be to assume the next one would be successful.") (quoting *Oatis v. Crown Zel-*

*lerbach Corp.*, 398 F.2d 496, 498 (5th Cir. 1968)); *see also Snell*, 782 F.2d at 1101.

In the present case, the threshold requirement for application of the single filing rule is met—namely, that Michetti has joined the preexisting suit of Funk, who had filed a timely charge of discrimination with the EEOC. The remaining inquiry—whether piggybacking is otherwise appropriate—is governed by the "broader" standard, as F & K Supply is of modest size. *See Tolliver*, 918 F.2d at 1058. Applying this broader standard, there is no question that Funk's and Michetti's claims arose out of similar discriminatory treatment during the same time frame. *See Snell*, 782 F.2d at 1100; *Tolliver*, 918 F.2d at 1058. Specifically, both plaintiffs were employed by F & K Supply during the same general time frame,[4] and each claimed that because of her sex, she had been subjected to an abusive, demeaning, humiliating, and degrading work environment at the hands of F & K's president, Aaron. Thus, Funk's timely charge with the EEOC satisfied the primary function of the timely-filing requirement: notifying defendants of the discrimination charge and providing them an opportunity for conciliation. Accordingly, the single filing rule waives the timely-filing requirement for Michetti.

**(ii) Sufficiency of the Trial Evidence**

 Defendants next seek judgment as a matter of law dismissing Michetti's and Funk's claims under Title VII and the HRL on the ground that the trial evidence was insufficient to show that Aaron's conduct was sex-motivated. Specifically, defendants cite to excerpts from the trial transcript to support their view that Aaron used sex-neutral obscenities indiscriminately towards both male and female employees at F & K Supply. While defendants admit in not so many words that Aaron acted boorishly on occasion, they contend that this does not equate to sex-based discrimination.

─────

4. Funk was employed by F & K Supply from August 1991 to November 1991 and April 1992 to February 1995. Michetti was em-

ployed by F & K Supply from August 1993 to June 1994.

■ Title VII[5] prohibits employers from discriminating "against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). "It is now well established that two forms of sexual harassment violate Title VII's prohibitions against workplace inequality: i) quid pro quo and ii) hostile work environment harassment." *Tomka,* 66 F.3d at 1304. This case involves only the second form.

■ To establish a claim for hostile work environment sexual harassment, a plaintiff must show "that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment." *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995). "Actionable sexual harassment must consist of more than isolated incidents or casual comments that express harassment or hostility." *Babcock v. Frank,* 783 F.Supp. 800, 808 (S.D.N.Y. 1992). Moreover, "[t]he harassment at issue must be 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.'" *Kotcher v. Rosa and Sullivan Appliance Ctr.,* 957 F.2d 59, 63 (2d Cir. 1992) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). In this regard, "the incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief." *Kotcher,* 957 F.2d at 63. As the Supreme Court held in *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the employee must subjectively perceive the environment to be abusive, and the environment must be one that a reasonable person would find hostile or abusive. "Although the harassment need not take the form of sexual advances or other explicitly sexual conduct in order to be actionable under Title VII, the plaintiff is required to establish that the harassment complained of was based on her gender." *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998) (internal citations omitted).

In this case, defendants have not established either a complete lack of evidence to support the jury's finding that the harassment was gender motivated, or an overwhelming amount of evidence in its favor. To the contrary, defendants' myopic view of the evidence is untenable. A brief review of the trial evidence is illustrative.

Plaintiff Michetti testified to an incident when Aaron called her into a conference room, where he was alone. Tr. at 459.[6] She testified that as she walked in, he looked her up and down, smirked, picked up a hotel "do not disturb" sign, and placed it on the outside door handle in front of a group of other employees standing outside the conference room. *Id.*

Further, Michetti testified that Aaron made sexual innuendos towards her. For example, she testified that Aaron "would look at me all the time, look at me up and down, checking me out, telling me that I have nice legs, commenting on that I was thin, that I was young, that he needed a young woman." Tr. at 450, 465. Michetti also testified that he asked her what type of clothing she wore on the weekends, whether she went to the gym, and whether she wore "little leotards" and "little body suits." Tr. at 450–51. She also testified that Aaron asked her whether she was Italian and that, when she replied yes, he asked her whether "Italian women [are] good in bed." Tr. at 467. She also testified that Aaron asked her to go away with him for a weekend in Vermont rather than

---

5. Because claims under Title VII and the HRL require the same standard of proof, the discussion relating to Title VII applies equally to plaintiffs' claims under the HRL. *See, e.g., Tomka,* 66 F.3d at 1304 n. 4; *Leibovitz v. New York City Transit Auth.,* 4 F.Supp.2d 144, 148 (E.D.N.Y.1998).

6. Citations to the trial transcript will be designated as "Tr. at ___."

having to go with his "bitch" wife. Tr. at 470.

Additionally, Michetti testified to incidents of improper contacts. She said that "Aaron would reach over the frontal part of me to grab the phone, where he would brush up against my chest and come unnecessarily close to me in reaching for the phone." Tr. at 476. She also testified that when she stood next to the conference table with her chair about six inches behind her, Aaron oftentimes sidestepped in between the chair and her, so that his body was touching her behind. Tr. at 476–77. When this occurred, she testified that she "felt him rub up against me." Tr. at 477–78.

Furthermore, Michetti testified to numerous incidents in which Aaron directed vituperative remarks to employees at F & K Supply, including "stupid cunt." Tr. at 435, 442–43.

Similarly, plaintiff Funk testified that Aaron frequently screamed vulgarities and was prone to tirades. Tr. at 746, 765, 767. Funk also testified that Aaron physically threatened her. Specifically, she testified to an incident when Aaron said: "I'll knock your teeth down your throat, and I'll kick your ass down those stairs." Tr. at 768, 776. She also testified to an incident when he threatened to break her arm. Tr. at 771, 774–76.

In addition to threats of physical abuse, Funk testified that Aaron threw a computer book at her. Tr. at 770. She testified to another confrontation as follows: "He walked over to me and put his hand on my chin, and—with a big red face. And he was so close, he was within an inch, two inches tops, with his hand on my chin, saying, shut your mouth. And I said, stop it. And he said, I will not stop it. I said, yes, you will. He did take his hands away, but not until after I felt all the saliva, and he was in my face, bright red, big black olive eyes bulging out." Tr. at 782.

Funk also testified that Aaron frequently used vulgarities in the workplace, including "stupid cunt" "asshole," and "fuck you." *See, e.g.,* Tr. at 815–16, 825. For example, she testified that he called her a "cunt," "dickbreath," "bitch," and that he told her to "blow him" and "you blow me." Tr. at 816, 828, 837–38; Michetti Testimony, Tr. at 481; *see Gross v. Burggraf Const. Co.,* 53 F.3d 1531, 1539 (10th Cir. 1995) ("It is beyond dispute that evidence that a woman was subjected to a steady stream of vulgar and offensive epithets because of her gender would be sufficient to establish a claim under Title VII. . . ."); *Burns v. McGregor Elec. Indus. Inc.,* 989 F.2d 959, 964 (8th Cir.1993) (noting that use of "bitch" and "cut" to woman was harassment based on her sex); *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1000 (10th Cir.1996) (noting that "curb side cunt" and "bitch" are "sexual epithets that have been identified as 'intensely degrading' to women."); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir. 1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995) ("It is one thing to call a woman 'worthless,' and another to call her a 'worthless broad.' "). *See generally* Katherine M. Franke, *The Central Mistake of Sex Discrimination Law: The Disaggregation of Sex From Gender,* 144 U.Pa.L.Rev. 1, 90–92 (1995).

Debra Bushey, a former employee of F & K Supply, testified that she heard Aaron call Funk and other women at F & K Supply "cunts" and "bitches." Tr. at 121–23. Marsha Travers, also a former employee of F & K Supply, testified that Aaron called Michetti a "stupid cunt on occasion." Tr. at 190. In addition, she testified that Aaron directed these and other plebeian words at Funk, including calling her a "whore," "stupid cunt," and "drunken bitch." Tr. at 210–11.

Accordingly, based on the trial evidence of Aaron's sexually offensive contacts, threats of physical violence, episodic tirades, physical assaults, sexually opprobrious remarks and innuendos, and frequent sexual epithets that were intensely degrading and extremely humiliating, defendants'

assertion that the evidence does not support the jury's finding of sex-motivated harassment simply does not wash.

Furthermore, this evidence belies defendants' sophistical assertion that because Aaron's conduct was targeted indiscriminately at both male and female employees, there is no evidence of sex-based discrimination. As the Ninth Circuit has recognized, "even if [the harasser] used sexual epithets equal in intensity and in an equally degrading manner against male employees, he cannot thereby 'cure' his conduct toward women." *Steiner*, 25 F.3d at 1464. To the contrary, it may be in such instances "that both men and women working [for defendant] have viable claims ... for sexual harassment." *Id.; see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (same sex harassment is actionable under Title VII). Similarly, the Seventh Circuit has espoused that it "would not seem to matter that the harasser might simultaneously be harassing a male co-worker with comparable epithets and comparable physical molestation.... [T]he victim's gender not only supplies the lexicon of the harassment, it affects how he or she will experience that harassment." *Doe v. City of Belleville, Ill.*, 119 F.3d 563, 578 (7th Cir.1997), *vacated on other grounds,* — U.S. ——, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998).

Accordingly, defendants' Rule 50(b) motion seeking dismissal of plaintiffs' claims under Title VII and the HRL on the ground that Aaron's conduct was not proven to be sex-based is denied.

### 3. Intentional Infliction of Emotional Distress Claims

#### (i) Preemption

 Defendants next seek dismissal of each of plaintiffs' claims of IIED based on sexual harassment, asserting that an IIED claim is not cognizable in light of Title VII and the HRL.

 Turning first to the federal statute, it is settled law that "[d]espite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment," Title VII does not limit the remedies of an aggrieved individual in private employment. *Johnson v. Railway Exp. Agency, Inc.* 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). The Supreme Court, in reaching this conclusion, has observed that "the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 48, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *see also Johnson*, 421 U.S. at 459, 95 S.Ct. 1716. In particular, the Court noted that "Title VII provides for consideration of employment-discrimination claims in several forums [and that] ... a claim to one forum does not [generally] preclude a later submission to another." *Alexander*, 415 U.S. at 47–48, 94 S.Ct. 1011 (citing 42 U.S.C. § 2000e–5(b) and (f)). It concluded that "[t]he clear inference is that Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination." *Id.* at 48–49, 94 S.Ct. 1011.

Defendants' reliance on *Brown v. General Servs. Admin.*, 425 U.S. 820, 829, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) is misplaced. *Brown* held that Title VII provides the exclusive judicial remedy for claims of discrimination in federal employment. Thus, defendants fail to recognize that *Brown* controls on the question of whether other remedies are available in *federal* employment, while *Johnson* and *Alexander* control in *private* employment. As plaintiffs' Title VII claims arose in the context of private employment, *Johnson* and *Alexander* counsel that Title VII does not limit plaintiffs' available remedies. Accordingly, defendants' assertion that Title VII preempts a claim under New York law of IIED based on sex discrimination is without merit.

■ The question of whether the HRL provides the exclusive remedy for discrimination claims under New York law is not as clear. Defendants urge the adoption of *Silberstein v. Advance Magazine Publishers, Inc.*, 988 F.Supp. 391, 392–93 (S.D.N.Y.1997). *Silberstein*, like here, involved a plaintiff asserting claims under Title VII and the HRL, along with a claim of IIED, based on sex discrimination in private employment. As one justification for granting defendant's motion to dismiss plaintiff's IIED claim, the *Silberstein* court reasoned:

> [T]he [HRL] is a statute dealing comprehensively with the subject of employment discrimination. It creates remedies that are products of legislative balancing of the respective interests of employers and employees. Most significantly, while the Legislature elected to create a private cause of action for damages in favor of those injured by violations of the statute, the statute does not permit recovery of punitive damages. As the statute permits recovery for mental anguish and emotional distress, the singular effect of recognizing a cause of action for intentional infliction of emotional distress based on employment discrimination would be to extend liability for punitive damages where the Legislature has declined to do so. By inviting this step, plaintiff in substance asks that the Court override the Legislature simply on the basis of its personal abhorrence of behavior such as that alleged here. This would be entirely inappropriate.

988 F.Supp. at 392–93 (internal footnotes omitted).

■ I disagree with *Silberstein* for several reasons. First, *Silberstein* is convincing only if you agree that the HRL creates an exclusive, pre-emptive remedial scheme for aggrieved individuals of sex discrimination. After examining the plain language and the legislative history of the HRL, I do not reach that conclusion. Like Title VII cases in private employment, the legislative history of the HRL reflects a manifestation to compliment and to augment existing remedies for aggrieved individuals.[7] The plain text of the HRL confirms this reading; for instance, the HRL contains no exclusivity clause or similar intention to circumscribe an aggrieved parties' remedies. *Compare Jansen v. Packaging Corp. of America*, 123 F.3d 490, 493 (7th Cir.1997) (finding that Illinois Human Rights Act preempted claim of IIED because it "confines claims of 'civil rights violation' under Illinois law to proceedings under the Act") (citing the Illinois Human Rights Act). Rather, the HRL states that "[a]ny person claiming to be aggrieved by an unlawful discrimination practice shall have a cause of action in any court of appropriate jurisdiction for damages and *such other remedies as may be appropriate.*" N.Y.H.R.L. § 297(9) (emphasis added). The HRL also allows for consideration of discrimination claims in alternative forums. N.Y.H.R.L. § 297(9). Had the legislature desired to make the HRL the exclusive remedy for sex discrimination claims, it could have done so. All of this suggests that the HRL was intended to supplement rather than supplant existing laws and institutions. Thus, allowing an aggrieved party to recover punitive damages under an IIED claim based on sexual harassment does not contravene the legislature's intent; rather, it promotes the legislature's goal of abrogating discriminatory practices through available means. *See* N.Y.H.R.L. § 290 (mincing no words in declaring that discriminatory practices it

---

7. N.Y.H.R.L. § 296 Legislative Findings (McKinney's 1993) (citing L.1967 c. 667, § 1) (addressing religious discrimination), provides in relevant part:

> This act is therefore enacted to clarify the existence of this right and to provide specific assurance of it, and should in no way be construed to limit the rights assured by the provisions of the law against discrimination or any other law, rule or regulation. It is *the intention of the legislature that this act* shall be construed liberally to effectuate the purposes for which it is enacted.

was interdicting violated fundamental principles underlying a free society and threatened the peace and tranquility of a democratic state).

Second, and consistent with this view, the majority of the courts in New York that have touched on the interplay between the HRL and the tort of IIED have held that sexual harassment in the workplace can give rise to both claims. *O'Reilly v. Executone of Albany, Inc.*, 121 A.D.2d 772, 503 N.Y.S.2d 185, 186 (3rd Dep't 1986) (recognizing claim of IIED based on sexual harassment); *Collins v. Willcox, Inc.*, 158 Misc.2d 54, 600 N.Y.S.2d 884 (1992) (recognizing that sex harassment can give rise to an IIED claim and that punitive damages can be awarded thereunder); *Murphy v. ERA United Realty*, 251 A.D.2d 469, 674 N.Y.S.2d 415, 418 (2d Dep't 1998) (affirming trial court's denial of summary judgment on claim of IIED based on sexual harassment, when plaintiff also brought an HRL claim); *Dana v. Oak Park Marina, Inc.*, 230 A.D.2d 204, 660 N.Y.S.2d 906, 910 (4th Dep't 1997) (sustaining claim of IIED when defendants recklessly installed videotape camera in the ladies' restroom). *But see McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 682 N.Y.S.2d 167, 168 (N.Y.A.D.1998) (citing *Silberstein* and holding that IIED claim is not cognizable).

Further, a number of New York cases, while not specifically addressing whether the HRL is the exclusive remedy for sexual harassment, impliedly adopt the majority position by dismissing claims of IIED based on sexual harassment on other grounds. *See, e.g., Ferrandino v. Alvin J. Bart & Sons, Inc.*, 247 A.D.2d 428, 668 N.Y.S.2d 99, 100 (N.Y.A.D.1998) (dismissing claim of IIED because it was not "so extreme in degree as to go beyond all possible bounds of decency"); *Trovato v. Air Express International*, 238 A.D.2d 333, 655 N.Y.S.2d 656, 657 (2d Dep't 1997) (same); *Foley v. Mobil Chemical Co.*, 214 A.D.2d 1003, 626 N.Y.S.2d 906, 907–908 (4th Dep't 1995) (same).

While a decision by New York's highest court regarding this issue would be decisive, federal courts "must [also] follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 466, 61 S.Ct. 336, 85 L.Ed. 284 (1940) (citations omitted); *see also Sphere*, 30 F.3d at 22–23 (stating that "in the absence of a Court of Appeals' decision squarely on point or an indication that the Court of Appeals is likely to disagree with the holdings of the Appellate Division, those holdings are entitled to persuasive, if not decisive, consideration") (internal quotations omitted). Here, there is no indication that New York's highest court would not follow the majority view that sexual harassment can give rise to a claim of IIED. Although the highest court remarked in dictum more than twenty years ago that "it may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability," see *Fischer v. Maloney*, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215 (1978), this remark, at best, has received checkered acknowledgment. The Second Circuit, in fact, has expressed uncertainty with regard to the continuing vitality of the *Fischer* dictum and the interplay between IIED and other remedies. *See Bender v. City of New York*, 78 F.3d 787, 791–92 (2d Cir.1996). Accordingly, the dictum in *Fischer* is not convincing evidence that it would not adopt the majority view.

Lastly, I am unable to locate any other federal decision within this Circuit that has not recognized, either expressly or impliedly, that sexual harassment can give rise to a claim of IIED under New York law. *See Casper v. Lew Lieberbaum & Co., Inc.*, 1998 WL 150993, *10 (S.D.N.Y. March 31, 1998) ("There is no question in New York 'that sexual harassment can give rise to a

claim for [IIED].' ") (quoting *Bonner v. Guccione*, 916 F.Supp. 271, 276 (S.D.N.Y. 1996)); *Seepersad v. D.A.O.R. Sec., Inc.*, 1998 WL 474205, *6 (S.D.N.Y. Aug.12, 1998) ("Sexual harassment, as outrageous and shocking behavior, can give rise to claims of [IIED]."); *Kudatzky v. Galbreath Co.*, 1997 WL 598586, *12 (S.D.N.Y. Sept.23, 1997) (same); *Shapiro v. AEO/Ricoh, Inc.*, 1997 WL 452026, *4 (S.D.N.Y. Aug.7, 1997) (same); *Olszewski v. Bloomberg L.P.*, 1997 WL 375690, *7 (S.D.N.Y. July 7, 1997) (same); *Polley v. Federal Reserve Bank of New York*, 1994 WL 465923, *7 (S.D.N.Y. Aug.23, 1994) (same); *Koster v. Chase Manhattan Bank, N.A.*, 609 F.Supp. 1191, 1198 (S.D.N.Y.1985) (same); *see also Ponticelli v. Zurich Am. Ins. Group*, 16 F.Supp.2d 414, 440–41 (S.D.N.Y.1998) (stating that although standard for an IIED claim is extremely difficult to satisfy, sexual harassment context can give rise to such claim); *Mariani v. Consolidated Edison Co. of N.Y., Inc.*, 982 F.Supp. 267, 275 (S.D.N.Y.1997) (same); *Rosetti v. Hudson Valley Community College*, 1997 WL 567936, *7 (N.D.N.Y. Sept.8, 1997) (same); *Rivera v. Prudential Ins. Co. of America*, 1996 WL 637555, *14 (N.D.N.Y.1996) (McAvoy, J.) (same); *Gerzog v. London Fog Corp.*, 907 F.Supp. 590, 604 (E.D.N.Y.1995) (same).

Accordingly, because the HRL does not limit the remedies of an aggrieved individual, and because the majority view of the New York courts, along with nearly every federal court, is that sexual harassment can give rise to a claim under New York law for IIED, defendants' assertion that sexual harassment is not cognizable as an IIED claim is without merit.

### (ii) Defendants' Remaining Arguments Relating to Plaintiffs' claims of IIED

■ Defendants next advance three other arguments for dismissal of the claims of IIED: (1) plaintiffs did not plead claims of IIED in their complaints; (2) plaintiffs did not prove claims of IIED at trial; and (3) Michetti's claim of IIED is barred by the statute of limitations.

Taking the third argument first for reasons that will become clear, a claim of IIED is governed by the one-year statute of limitations for intentional torts. N.Y.C.P.L.R. § 215(3); *Peters v. Citibank, N.A.*, 677 N.Y.S.2d 626, 626 (2d Dep't 1998). The one-year period is not tolled by the pendency of a charge with the EEOC. *See, e.g., Casper*, 1998 WL 150993, at *5.

Here, Michetti left F & K's employ in June 1994. She did not commence this lawsuit until August 2, 1995, which is approximately two months after the expiration of the statute of limitations.

Michetti concedes as much but counters that defendants have waived the right to assert the defense of the statute of limitations by not raising it in their Answer. Her counter-argument, in turn, returns us to defendants' argument that plaintiffs did not plead claims of IIED in accordance with FED.R.CIV.P. 8(a)(2). This is because defendants contend that they had no notice of plaintiffs' claims of IIED until pre-trial, depriving them of the ability to raise the defense in their responsive pleading.

■ Rule 8(a)(2) requires that a complaint contain, inter alia, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a)(2). The only function of the pleading is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Further, "[a]ll pleadings shall be so construed as to do substantial justice." FED.R.CIV.P. 8(f). After reviewing the Complaints of Michetti and Funk under this standard, I find that both provided adequate notice to defendants of the IIED claims. *See* Michetti Compl., at ¶¶ 2, 4, 20; Funk Compl., at ¶¶ 47–48. Accordingly, defendants' first argument fails not only in its own right but also inasmuch as defendants apply it as a panacea for not

pleading the statute of limitations as an affirmative defense in their Answer.

■ Turning now to Michetti's waiver assertion, Rule 8(c) of the Federal Rules of Civil Procedure provides that the statute of limitations, as an affirmative defense, must be set forth in a party's responsive pleading. The general rule in this Circuit is that the statute of limitations "must be asserted in a party's responsive pleading 'at the earliest possible moment' and is a personal defense that is waived if not promptly pleaded." *Davis v. Bryan,* 810 F.2d 42, 44 (2d Cir.1987) (quoting *Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152, 1155 (2d Cir.1968)).

In the present case, defendants belatedly raised the defense of the statute of limitations approximately two and a half years after commencement of this action, on the eve of trial in their pre-trial submissions. This does not comport with the law of this Circuit in two respects: first, the defense was not raised "at the earliest possible moment"; and second, the defense was not interposed in defendants' responsive pleading. *See id.; United States v. Landau,* 155 F.3d 93, 107 (2d Cir.1998) (finding waiver of defense of statute of limitations when raised in defendants' motion for summary judgment); *Litton,* 967 F.2d at 751–52 ("A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, it is waived if not raised in the answer to the complaint.") (emphasis added); *Sanghvi v. Frendel,* 1999 WL 14708, *1 (E.D.N.Y. Jan.6, 1999) (finding waiver of defense of statute of limitations when raised for first time in pre-trial memorandum of law); *HCC, Inc. v. RH & M Machine Co.,* 1998 WL 765176, *1 (S.D.N.Y. Nov.2, 1998) ("[A]n affirmative defense may not form the basis for a dispositive motion unless it was raised in the answer to the complaint.") (citing Second Circuit cases); *Connolly v. Bidermann Ind. U.S.A.,* 1998 WL 305643, *8–*9 (S.D.N.Y. June 9, 1998) (finding waiver when statute of limitations raised, for first time, in defendant's motion

for summary judgment filed two and a half years after commencement of the action); *Bergstein v. Jordache Enter.,* 1995 WL 406113, *3 (S.D.N.Y. July 7, 1995) (holding that defendants waived statute of limitations when first raised in their motion for summary judgment); *Charpentier v. Godsil,* 937 F.2d 859, 863 (3d Cir.1991) ("A trial brief ... is not an appropriate vehicle for raising an affirmative defense covered by Rule 8(c)."); *Venters v. City of Delphi,* 123 F.3d 956, 969 (7th Cir.1997) ("[I]f Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff.").

It also is significant that while defendants have asserted the defense of the statute of limitations in their pre-trial submissions and in the present post-trial motion, they have never sought leave pursuant to Rule 15 to amend their Answer to interpose this defense. Contrary to defendants' belief, simply raising the argument on the eve of trial in their pre-trial submissions does not satisfy any of the settled procedures for amending a pleading to interpose such a defense. *See* FED.R.CIV.P. 15(a); N.D.N.Y.L.R. 7.1(a)(4); *Wade v. Orange County Sheriff's Office,* 844 F.2d 951, 955 (2d Cir.1988) (finding waiver when "[a]ppellants neither raised such a defense in their answers to the complaint nor moved to amend their answers to add such a defense."). Defendants apparently rely, alternatively, on the view propounded by some circuits that a party may assert an affirmative defense for the first time on motion. *See, e.g., Blaney v. United States,* 34 F.3d 509, 512–13 & n. 3 (7th Cir.1994) (collecting cases); *Camarillo v. McCarthy,* 998 F.2d 638, 639 (9th Cir.1993); *Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1374 (3d Cir.1993). In effect, this view holds that technical failure to comply with Rule 8(c) is not fatal, so long as the error is not prejudicial. *See Blaney,* 34 F.3d at 512 & n. 3; *Camarillo,* 998 F.2d at 639; *Kleinknecht,* 989 F.2d at 1374. This Cir-

cuit, however, does not appear to recognize this more forgiving line of authority. Indeed, it appears inconsistent with both Circuit and district precedent. *See Landau,* 155 F.3d at 107; *Litton Indus.,* 967 F.2d at 751–52; *Davis,* 810 F.2d at 44; *HCC, Inc.,* 1998 WL 765176, at *1. This more forgiving authority also is suspect. If a party is permitted to raise an affirmative defense by motion, Rule 8(c) is emasculated to the point of nullity. Moreover, the view is inconsonant with the notice function of Rule 8(c) and the discretionary design of Rule 15. As aptly explained by the District of Columbia Circuit in *Harris v. Secretary, U.S. Dept. Of Veterans Affairs,* 126 F.3d 339, 344–47 (D.C.Cir.1997), "the structure dictated by Rules 8(c) and 15(a)" is "subtly alter[ed] in two ways" when a party is allowed to assert an affirmative defense for the first time by motion instead of by amendment under Rule 15(a). First, by relieving a party "of the need to request amendment, . . . [t]his [ ] allows parties to omit affirmative defenses in pleadings strategically, in violation of the notice purpose." *Id.* at 344–45. "Second, automatically permitting late raising of affirmative defenses where no prejudice has occurred reduces the multifarious reasons for denying leave to amend envisioned by the Court in *Forman* to the single, nonexhaustive factor of prejudice." *Id.* at 345. Accordingly, "[i]n order to preserve the notice purpose of Rule 8(c) and the discretionary structure of Rule 15(a), [*Harris*] held that Rule 8(c) means what it says: a party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion." *Id.; Accord Ashe v. Corley,* 992 F.2d 540, 545 n. 7 (5th Cir.1993).

Accordingly, because defendants did not promptly plead the defense of the statute of limitations in their responsive pleading, and because they never sought leave pursuant to Rule 15 to amend their Answer to interpose this defense, the defense has been waived.

 Defendants' remaining argument for judgment as a matter of law is that the evidence adduced at trial was insufficient to establish that either of the plaintiffs suffered severe emotional distress or that any such distress they may have suffered was caused by Aaron's discriminatory conduct.

 Once again, however, a procedural bar stands in the way of defendants' argument.[8] "The rule is well established that a motion for directed verdict at the close of all the evidence is a prerequisite for [judgment as a matter of law]." *Hilord Chemical Corp. v. Ricoh Elec., Inc.,* 875 F.2d 32, 37 (2d Cir.1989). Under the specificity requirement, "judgment as a matter of law is limited to those issues '*specifically* raised in [a] prior motion for a directed verdict.'" *Cruz v. Local Union Number 3 of the Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1155 (2d Cir.1994) (emphasis added) (quoting *Samuels v. Air Transport Local 504,* 992 F.2d 12, 13 (2d Cir.1993)); *see also* FED.R.CIV.P. 50(a)(2) ("Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment."); *Galdieri–Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 286 (2d Cir.1998) (same). The rationale for requiring the motion for a directed verdict (now called a motion for judgment as a matter of law) as a condition precedent to a judgment notwithstanding the verdict (now called a renewed motion for judgment as a matter of law) "is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him [or her] from taking the case to the jury." *Baskin v. Hawley,* 807 F.2d 1120, 1134 (2d Cir.1986) (internal quotation marks and citation omitted). "[I]f an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is required

---

8. Although this issue was not raised by plaintiffs, I may raise it *sua sponte. See Blissett v.* *Eisensmidt,* 940 F.Supp. 449, 455 (N.D.N.Y. 1996).

to prevent manifest injustice." *Cruz*, 34 F.3d at 1155 (internal quotations and citations omitted).

In the present case, defendants moved under Rule 50(a) for judgment as a matter of law at the close of plaintiffs' evidence, which they renewed at the close of all the proof. In making that trial motion, however, defendants only challenged plaintiffs' claims of IIED on the grounds of insufficiency of the pleadings and sexual harassment not being cognizable as an IIED claim.[9] Tr. at 970. Defendants never challenged plaintiffs' claims of IIED on the grounds that there was insufficient evidence to establish that plaintiffs suffered severe emotional distress or that Aaron's alleged discriminatory conduct caused any such distress. Consequently, because defendants did not specifically raise these issues in their Rule 50(a) motion so as to notify plaintiffs of the asserted deficiencies in the proof, the motion cannot now be granted unless it is necessary to prevent manifest injustice. *See, e.g., Cruz*, 34 F.3d at 1155. As no manifest injustice will result from not granting defendants' motion, it must, for this reason alone, be denied.

Even assuming, *arguendo*, that defendants are entitled to a review on the merits, their motion still fails. To succeed on a claim for IIED under New York law, a plaintiff must prove four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress." *See, e.g., Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993). Here, defendants assert that the evidence was insufficient on the third and fourth elements.[10] A brief review of the evidence shows otherwise.

With respect to plaintiff Michetti, she testified that she got "sick about coming to work." Tr. at 415. She also testified that following an incident with Aaron, she was so scared and shaking so badly that she almost wet her pants. Tr. at 443–44. After another incident, she testified that she felt "cheap, disrespected, angry, confused" and that she had no control over her life. Tr. at 472. She also testified that she broke down and cried at work following a confrontation with Aaron. Tr. at 512. Generally, she said she was "consumed" with work and that she would come home "depressed." Tr. at 473. In addition, she testified to headaches, sickness, loss of appetite, occasional vomiting, diarrhea, and stomach pains. Tr. at 499–501.

With respect to plaintiff Funk, she testified that as a result of working at F & K Supply, she was emotionally distressed. Tr. at 797. She also testified to having "flashbacks" and "nightmares" of Aaron. Tr. at 846. Generally, she said she felt "humiliated, intimidated, degraded" and "mentally distressed." Tr. at 857. Gale Brightly, a former F & K employee, observed Funk crying at work. Tr. at 946. Similarly, Debra Bushey, Marsha Travers and Christine Bahret, all former employees of F & k Supply, testified that following incidents between Funk and Aaron, each observed Funk crying, shaking and very upset. Tr. at 133, 214, 276–77. Bushey also testified that Funk seemed "very tense and nervous at work." Tr. at 176.

Viewing this evidence in the light most favorable to the plaintiffs, and giving them the benefit of all reasonable, favorable inferences the jury might have drawn from the evidence, I find that defendants have not established either a complete lack of evidence to support the verdict with respect to the third and fourth elements of Funk's and Michetti's claims of IIED, or

---

**9.** Defendants have renewed their motion for judgment as a matter of law on these grounds, which I have denied. *See supra* II(A)(4)(i), (ii).

**10.** Defendants make no argument that the evidence was insufficient with respect to the first and second elements.

an overwhelming amount of evidence in their favor. Accordingly, defendants' motion for judgment as a matter of law on the IIED claims based on insufficient evidence is denied.

### B. Defendants' Motion for a New Trial

#### 1. The Standard Under Rule 59:

A less stringent standard applies to a motion to set aside the verdict and for a new trial pursuant to Rule 59(a). A trial court should grant such a motion when convinced that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice. *DLC Management Corp. v. Town of Hyde Park,* 163 F.3d 124, 133 (2d Cir.1998); *Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 132–33 (2d Cir.1986). Furthermore, a court may weigh conflicting evidence and need not view such evidence in the light most favorable to the nonmoving party. *Song v. Ives Lab., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992). A trial judges's disagreement with the jury's verdict alone, however, is insufficient reason to grant the motion for a new trial. *Saloomey v. Jeppesen & Co.,* 707 F.2d 671, 679 (2d Cir.1983).

#### 2. The Standard Applied

In this case, defendants advance three grounds for a new trial: (1) the plaintiffs improperly introduced evidence of insurance at trial; (2) the jury verdict sheet was defective; and (3) the verdict is grossly excessive, requiring substantial remittitur, or, alternatively, a new trial.

##### (i) Evidence of Insurance

Defendants first contend that because plaintiffs' counsel introduced evidence of defendants' insurance coverage at trial, they are entitled to a new trial. Defendants are very much in error.

First, defendants' papers fail to mention that I sustained their objection to the question of insurance coverage immediately after it was posed by plaintiffs' counsel. Tr. at 373–74. Second, defendants' omit that a sidebar discussion ensued during which defendants moved for a mistrial. At that time, plaintiffs' counsel explained that he had posed the question for purposes of impeaching Aaron. Specifically, plaintiffs' counsel asserted that he had received information that Aaron had committed insurance fraud when applying for insurance coverage. I then ruled, however, that though the evidence may have relevance, it was inadmissible because its probative value was substantially outweighed by the danger of unfair prejudice. Tr. at 374–378; *see also* F.R.E. 403. Third, and in similar fashion, defendants overlook that I gave a brief curative instruction to the jury that it must not consider the question of insurance coverage. Tr. at 379.

Accordingly, defendants' motion for a new trial based on the assertion that plaintiffs introduced information of Aaron's insurance coverage is without merit.

##### (ii) The Verdict Sheet

Defendants next assert that the verdict sheet is unworkable because it did not delineate between the defendants and various claims. Again, I disagree.

The jury in this case was given an exhaustive, thirteen page verdict sheet that distinguished each of plaintiffs various claims against each defendant. After reaching a verdict, the clerk read the jury's response to each question in open court. The verdict sheet, in short, was workable; it appropriately separated the claims against the parties as necessary. Specifically, the verdict sheet distinguished each plaintiff and their separate claims. It also asked whether Aaron committed acts of sexual harassment against plaintiffs. In an overabundance of caution it inquired whether F & K Supply may be held responsible for Aaron's acts of gender harassment should the jury find Aaron committed sexual harassment.[11]

---

11. As plaintiffs' former employer, F & K Sup- ply is vicariously liable to plaintiffs for an

The jury charge did not—as it need not—distinguish between the Title VII and the HRL claims with respect to the standard of proof. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714–15 (2d Cir.1996). I did, however, instruct the jury that the basic difference between the two statutory schemes related to who may be held liable. *See id.; Bush v. Raymond Corp., Inc.* 954 F.Supp. 490, 496 (N.D.N.Y. 1997). Specifically, the jury was instructed that Aaron could not be held liable under Title VII.[12] While defendants now appear to suggest that the jury should have been required to apportion damages between the two defendants and between the Title VII and HRL claims, this concern does not appear to have been raised at trial. *Bick v. City of New York,* 1998 WL 190283, *21 (S.D.N.Y. Apr.21, 1998) ("The jury was not directed to identify whether its award was under federal or state law since the standards are the same, and neither party requested such an inquiry.") (internal citations omitted); *Luciano v. Olsten Corp.,* 912 F.Supp. 663, 675 (E.D.N.Y.1996) ("[Defendants did not request the Court to direct the jury to identify the particular law under which the damages were being awarded.]"), *aff'd,* 110 F.3d 210 (2d Cir.1997); *see also Anderson v. YARP Restaurant, Inc.,* 1997 WL 27043, *6–*7 (S.D.N.Y. Jan.23, 1997) ("Because the standard of proof for sexual harassment claims and for damages is the same under Title VII as that under the HRL, the jury was not asked to demarcate which portion of the damage award was based upon Title VII and which portion was based upon the HRL.").

In any case, the jury plainly found Aaron liable under plaintiffs' HRL and IIED claims, and F & K Supply liable under plaintiffs' Title VII and HRL claims. As

compensatory damages, the jury awarded as follows: $885,000 to Funk, representing $850,000 for emotional pain and anguish and $35,000 for lost wages and benefits; and $465,000 to Michetti, representing $450,000 for emotional pain and anguish and $15,000 for lost wages and benefits. Additionally, the jury concluded that both Funk and Michetti were entitled to punitive damages against defendants Aaron and F & K Supply. The jury awarded each plaintiff punitive damages of $50,000 and $1 against Aaron and F & K Supply, respectively.

The issue that frequently arises when a plaintiff brings claims under both Title VII and the HRL, and the one that defendants apparently take issue with here, is how to allocate damages when recovery can be recognized under alternative theories. This issue is significant because of two basic differences between Title VII and the HRL. The first is that Title VII places a cap on the available sum total of compensatory and punitive damages,[13] while the HRL does not limit compensatory damages. The second is that though Title VII permits recovery for punitive damages, the HRL does not.

In determining allocation in such instances, courts have adopted the sensible approach, consistent with Circuit preference, *see Magee v. United States Lines, Inc.,* 976 F.2d 821, 822 (2d Cir.1992), that the jury award be allocated under the liability theory that provides plaintiff the most complete recovery. *Bick,* 1998 WL 190283, at *21; *Anderson,* 1997 WL 27043, at *6–*7; *Ginsberg v. Valhalla Anesthesia Assocs., P.C.,* 1997 WL 669870, at *2 (S.D.N.Y.1997); *Luciano,* 912 F.Supp. at 675. Generally, to avoid the limits on

---

12. Defendants also forget that I dismissed the Title VII claims against Aaron at trial. *See Tomka,* 66 F.3d at 1313.

13. In this case, the statutory cap under Title VII is $50,000. *See* 42 U.S.C. § 1981a(b)(3)(a).

actionable hostile environment created by Aaron, a supervisor with immediate (or successively higher) authority over them. *See Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633, (1998); *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

damages under Title VII, this approach will result in the allocation of all the recovery to the HRL claim. *See, e.g., Bick,* 1998 WL 190283, at \*21; *Ginsberg,* 1997 WL 669870, at \*2; *Luciano,* 912 F.Supp. at 675. However, when punitive damages are interjected into the equation, compensatory damages can be recoverable under the HRL claim, and punitive damages under the Title VII claim to the extent consistent with the Title VII statutory cap. *See Anderson,* 1997 WL 27043, at \*6–\*7.

Consistent with this view, then, I allocate Funk's and Michetti's damages as follows: all compensatory damages in favor of plaintiffs and against F & K Supply and Aaron to the HRL claims; all punitive damages in favor of plaintiffs and against F & K Supply to the Title VII claims; and all punitive damages in favor of plaintiffs and against Aaron to the IIED claims.[14] *See Bick,* 1998 WL 190283, at \*21; *Anderson,* 1997 WL 27043, at \*6–\*7; *Luciano,* 912 F.Supp. at 675. "This interpretation permits plaintiff to receive the full amount awarded by the jury without exceeding the legal limits placed upon sexual harassment claims under Title VII and the HRL." *See Anderson,* 1997 WL 27043, at \*7.

Accordingly, defendants' motion for a new trial based on errors in the verdict sheet is denied.

### (iii) Remittitur

■ Lastly, defendants' move for remittitur, or, alternatively, a partial new trial on damages, on the ground that the jury's compensatory awards to Funk and Michetti for emotional anguish under the HRL of $850,000 and $450,000 are excessive.

■ "If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount"—which should be the maximum award that would not be excessive. *Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir.1995) (citing *Phelan v. Local 305 of the United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus.,* 973 F.2d 1050, 1064 (2d Cir.1992), *cert. denied,* 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993)). Simply put, remittitur is "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328 (2d Cir.1990) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984)).

Because plaintiffs' compensatory awards were made pursuant to the HRL, I look to New York State law in determining whether the awards are excessive. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 437–38, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (holding that federal district court must apply New York state law in determining whether damage awards on diversity claims are excessive); *Consorti v. Armstrong World Indus., Inc.,* 103 F.3d 2, 4 (2d Cir.1995); *Anderson,* 1997 WL 190283, at \*6–7. The relevant law is set forth in C.P.L.R. S 5501(c) (McKinney 1995). That section provides in part as follows:

> In reviewing a money judgment ... in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

*Id.* Although directed at the appellate divisions, section 5501(c) applies to trial courts

---

**14.** The jury, in fact, necessarily allocated the awards for emotional distress against Aaron to either the HRL or IIED claims; the awards of back pay against both defendants to the HRL claims; and punitive damages against F & K Supply to the Title VII claims, and against Aaron to the IIED claims.

as well. *See Gasperini,* 518 U.S. at 431, 116 S.Ct. 2211.

■ .In determining whether a jury award is excessive under this standard, New York courts review the evidence adduced at trial in support of the challenged damage award and compare it to the awards in similar cases. *Gasperini,* 518 U.S. at 425, 116 S.Ct. 2211 (citing New York cases). Here, the specific evidence adduced at trial of the damages suffered by each plaintiff has already been discussed. *See infra* discussion at II(A)(4)(ii). Upon review, I now note the paucity of evidence regarding the magnitude, severity and duration of the emotional anguish suffered by plaintiffs.

After canvassing comparable cases, I find that the jury's awards for emotional damages to Funk and Michetti of $850,000 and $450,000, respectively, are excessive. For example, in *McIntosh v. Irving Trust Co.,* 887 F.Supp. 662, 669 (S.D.N.Y.1995),[15] Judge Koeltl reduced a $219,428.00 compensatory damage award under the HRL to $20,000. The plaintiff in *McIntosh* testified that defendant's retaliatory acts made him feel "humiliated," "shocked" and "angry." *Id.* at 664. The plaintiff also testified to his humiliation and embarrassment, and that he suffered physical symptoms such as weakness in his legs, stomach cramps and chest pains, forcing him to visit a doctor on one occasion. *Id.* Plaintiff further testified that upon being terminated, he "was devastated," angry and depressed. *Id.* Judge Koeltl concluded that "[b]ecause the plaintiff introduced such sparse evidence with respect to the magnitude and duration of any emotional injury or mental distress that he sustained, the jury was forced to speculate in awarding him compensatory damages." *McIntosh,* 887 F.Supp. at 665.

Similarly, in *Quality Care v. Rosa,* 194 A.D.2d 610, 599 N.Y.S.2d 65 (2d Dep't 1993), plaintiff testified that she was " 'shock[ed]' and 'devastated' by her termi-

nation, that she was 'in a real pickle,' and that she felt bad." *Id.* at 66. The Second Department found that "in the absence of any evidence of the duration of [complainant's] condition, its severity or consequences, and in the absence of evidence of any medical treatment[,]" a $10,000 award for emotional damages required remittitur to $5,000. *Id.* This holding is consistent with a number of cases under the HRL dealing with "garden variety emotional distress," see *Luciano,* 912 F.Supp. at 673, which generally span the 5,000 to $30,000 range. *See, e.g., Kim v. Dial Serv. Intern.,* 1997 WL 458783, at *12–*13 (S.D.N.Y. Aug.11, 1997) (reducing award of $300,000 to $25,000 where plaintiff testified that he felt "gloomy," had lost weight, drank more, took sedatives and had trouble sleeping); *Tanzini v. Marine Midland Bank,* 978 F.Supp. 70, 79 (N.D.N.Y.1997) (reducing $200,000 award for mental anguish to $30,000); *Binder v. Long Island Lighting Co.,* 847 F.Supp. 1007, 1028 (E.D.N.Y.1994) (pain and suffering award of $497,738 reduced to $5,000), *rev'd in part on other grounds,* 57 F.3d 193 (2d Cir.1995); *Borja–Fierro v. Girozentrale Vienna Bank,* 1994 WL 240360, *3–*4 (S.D.N.Y. May 27, 1994) (reducing $185,000 mental anguish award to $15,000 under "shocks the conscience" standard); *New York State Office of Mental Retardation and Developmental Disabilities v. State Div. of Human Rights,* 183 A.D.2d 943, 583 N.Y.S.2d 580 (N.Y.A.D.1992) (reducing award from $75,000 to $7,500); *see also Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1190 (2d Cir.1992) (upholding $18,000 award under HRL where plaintiff testified that losing his job was "like a divorce, your wife died or state of shock").

Moreover, cases upholding higher awards almost invariably involved circumstances in which the magnitude, duration, and severity of the harm were greater than in the present case. The Second Department, in *New York City Transit*

---

**15.** Notably, Judge Koeltl determined that the verdict was excessive under the more stringent "shocks the conscience" standard. *McIntosh,* 887 F.Supp. at 664.

*Auth. v. State Div. of Human Rights,* 181 A.D.2d 891, 185 A.D.2d 889, 581 N.Y.S.2d 426 (N.Y.A.D.1992), *appeal denied,* 80 N.Y.2d 762, 592 N.Y.S.2d 671, 607 N.E.2d 818, (1992), upheld a $450,000 award for compensatory damages in a sexual harassment case under the HRL. In that case, the complainant suffered four intentional instances of sex discrimination relating to her pregnancy, and testified that she "suffered anguish, guilt, depression, and anger at the time of each occurrence, and that her mental anguish persisted ... [for] a period of more than six years." *Id.* at 429. Moreover, the court found sufficient evidence that such anguish would persist for the remainder of the complainant's life. *Id.* The court was at a loss to find any New York case involving "the type of prolonged, intentional sex discrimination committed by the NYCTA in this case, or any case where the magnitude of the psychic injury was comparable to that suffered by the complainant." *Id.*

In *Shea v. Icelandair,* 925 F.Supp. 1014 (S.D.N.Y.1996), the district court reduced a $250,000 jury award for compensatory damages in an age discrimination case under the HRL to $175,000. In that case, plaintiff presented (1) expert medical testimony that the stress brought on by defendant's discriminatory acts aggravated the symptoms of plaintiff's Parkinson's disease and brought on cardiac symptoms, *id.* at 1022–24; and (2) "compelling evidence of his emotional anguish and humiliation," including detailed testimony by plaintiff of the effect his demotion had on his day-to-day living. *Id.* at 1024–25. The court found that the aggravation of plaintiff's physical symptoms and the severity of the emotional distress suffered by him set the case apart from cases of " 'garden variety emotional distress.' " *Shea,* 925 F.Supp. at 1025 (quoting *Luciano,* 912 F.Supp. at 663). *Luciano* itself involved facts similar to those in the present case. In *Luciano,* the plaintiff was a high-level career woman who, instead of being promoted to Vice President as promised ... was terminated, as the jury found. There was testimony

that as a result of the termination Luciano was hurt, shocked, upset, overcome with sadness and depression, that she cried worried about finances, had trouble sleeping and eating and felt purposeless. *Id.* at 673–74. The district court upheld as reasonable an award of $11,400 for plaintiff's emotional damages. *Id.* at 674.

More recently, in *Bick,* 1998 WL 190283, at *23, plaintiff testified to feeling "devastated." As a result, she telephoned a counseling service for depressed or suicidal police, which she remained in contact with for approximately one year. *Id.* She also testified to seeking treatment from a certified social worker in psychotherapy. *Id.* As of the time of trial, she had undergone 45 treatments with the social worker, with treatment ongoing. *Id.* The social worker, moreover, diagnosed plaintiff as suffering from "suicidal ideation, ... which she described as 'a feeling of desperation' and a desire to have 'a respite' from one's life, but without an articulated plan for achieving such long-term respite." *Id.* at *24. The court found that a $750,000 award for pain and suffering required remittitur to $100,000. *Id.* at *26.

In sum, these cases and the evidence adduced at trial make clear that the awards to Funk and Michetti for mental distress of $850,000 and $450,000, respectively, "deviate materially from what would be reasonable compensation." C.P.L.R. 5501(c). After considering each plaintiff's case separately, I find that the maximum amount that Funk and Michetti could each recover under New York law for mental anguish is $30,000. Accordingly, if either plaintiff does not accept a remittitur of the emotional damage award to $30,000, her case will be re-tried solely on the issue of compensatory damages for emotional anguish. Each plaintiff shall notify the Court and defendants in writing by March 29, 1999 of her election.

Lastly, defendants apparently seek remittitur of the punitive awards of $50,000 and $1 in favor of each plaintiff

and against Aaron and F & K Supply. However, this is not entirely clear. While defendants' motion *discusses* only remittitur of the compensatory awards for mental anguish, it does reference punitive damages and the sum award against defendants as evidence .of excessiveness. Assuming remittitur of the punitive awards is sought, it is denied.

The Supreme Court, in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), enumerated three factors that bear upon the reasonableness of punitive damage awards: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between the punitive damage remedy and civil penalties authorized or imposed in comparable cases. Applying the *Gore* factors here, the evidence adduced at trial showed that Aaron's conduct was highly reprehensible. Further, the ratio of punitive damages to the adjusted compensatory award is close. Lastly, the difference between the punitive damages remedy and civil penalties authorized in comparable cases is minimal to nonexistent. Mindful of the purposes of punitive damages, I conclude that the punitive awards in this case fall well within the bounds of reasonableness. *See, e.g., Anderson*, 1997 WL 27043, at *9 (finding $50,000 award of punitive damages in sexual harassment case reasonable); *Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 415 (S.D.N.Y.1996) (reducing $250,000 award of punitive damages in sexual harassment case to $50,000).

## B. Plaintiffs' Motion for Attorney's Fees

Turning now to plaintiffs' motion for attorneys' fees and costs pursuant to 42 U.S.C. § 2000e–5(k), plaintiffs seek attorneys' fees in the amount of $255,568.50 and expenses in the amount of 5,026.97.

 As prevailing parties, plaintiffs are entitled to reasonable attorneys' fees. 42 U.S.C. § 2000e–5(k). To determine a reasonable fee, a court must first establish a "lodestar" figure by multiplying the number of hours reasonably expended by the party's attorneys by a reasonable hourly rate. *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The resulting lodestar may then be adjusted, at the district court's discretion, based on other factors. *Hensley*, 461 U.S. at 429 n. 3, 103 S.Ct. 1933. (enumerating other factors).

## 1. The Lodestar Figure

## A. Hourly Rates

 To determine the hourly rate, the Supreme Court has adopted a marketplace model, *Blum*, 465 U.S. at 896, 104 S.Ct. 1541, which contemplates "the normal rate in the legal community for substantially similar work by competent practitioners." *Fiacco v. Rensselaer*, 663 F.Supp. 743, 745 (N.D.N.Y.1987); *see Levy v. Scranton*, 1992 WL 265936 (N.D.N.Y.1992); *Auburn Enlarged City Sch. Dist. v. Coastal Env. Safety and Control, Inc.*, 1990 WL 19139 (N.D.N.Y.1990). The district court also considers other rates that have been awarded in similar cases in the same district. *Levy*, 1992 WL 265936, at *3; *Miner v. City of Glens Falls*, 1992 WL 349668 (N.D.N.Y.1992), *aff'd*, 999 F.2d 655 (2d Cir. 1993); *Fiacco*, 663 F.Supp. at 745; *Auburn Enlarged City Sch. Dist.*, 1990 WL 19139, at *2.

In this case, plaintiffs' lead counsel, Jerold Slate, seeks fees at the hourly rate of $215. The prevailing market rate within the Northern District of New York, however, is generally no more than $150 per hour for practitioners with significant experience. *See, e.g., Serbalik v. Gray*, 1999 WL 34989, *3 (N.D.N.Y.1999); *Marshall v. State of New York*, 31 F.Supp.2d 100, 104 (N.D.N.Y.1998); *Abou–Khadra v. Bseirani*, 971 F.Supp. 710, 718 (N.D.N.Y.1997); *Equal Employment Opportunity Comm'n v. American Fed'n of State, County and*

*Mun. Employees,* 1996 WL 663971 (N.D.N.Y. Nov.12, 1996). Moreover, though Slate argues for application of an hourly rate of $215 per hour, his affidavit admits elsewhere that he "verily believe[s] that the legal fee of $150 per hour based upon [his] experience, prevailing rate and legal fees charged by other attorneys who practice before this court is reasonable in all respects." Slate Affidavit in Support of Attorneys' Fees, at ¶ 11. In light of the experience Slate recounts in his affidavit, he will be compensated at the hourly rate of $150 for practitioners with significant experience.

▮ Slate also seeks to recover for his travel time at the hourly rate of $100 per hour. Travel time, however, is generally recoverable at the rate of one-half a lawyer's awarded hourly rate. *See, e.g., Marshall,* 1998 WL 886967, at *4; *McLaughlin v. State of New York,* 1998 WL 915431, *2 (N.D.N.Y. Dec.22, 1998). Therefore, Slate will be reimbursed for travel time at the hourly rate of $75.

Plaintiffs also seek hourly fees for two associates, Maura Barrett and David Resnick, as follows: $75 per hour for legal work, and $35 per hour for paralegal work. These rates are well in line with the prevailing market rates; thus, they are accepted. *See, e.g., Serbalik,* 1999 WL 34989, at *3; *Hannigan v. Board of Educ.,* 1997 WL 10971, at *8 (N.D.N.Y. Jan.9, 1997).

## B. Reasonable Hours

▮ To recover attorneys' fees, the party must support the application with contemporaneous time records of work performed. *See Lewis v. Coughlin,* 801 F.2d 570, 577 (2d Cir.1986). Plaintiffs' attorneys have submitted such records, and request compensation for a total of 1,399.1 hours for legal work and 147.5 hours for paralegal work. Specifically, plaintiffs' counsels' hours are as follows: 1039.1 to Slate for legal work; 192.4 to Barrett for legal work and 85.1 to her for paralegal work; and 167.1 hours to Resnick for legal work and 62.4 hours to him for paralegal work.

While defendants have submitted a host of objections to the hours requested by plaintiffs' counsel, only some of these objections merit discussion. *See, e.g., Lunday v. City of Albany,* 42 F.3d 131, 134 (2d Cir.1994) (district court not required to "set forth item-by-item findings concerning what may be countless objections to individual billing items.").

First, defendants contend that attorney Slate has spent an excessive amount of time researching fundamental issues. As support, they cite to a number of Slate's billing entries.

▮ "If the court determines that certain claimed hours are 'excessive, redundant, or otherwise unnecessary ...' the court should exclude those hours in its calculation of the lodestar." *Gierlinger v. Gleason,* 160 F.3d 858, 876 (2d Cir.1998) (citations omitted). Importantly, "in making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Id.* (citations omitted).

After reviewing a number of Slate's entries, it is apparent that he devoted an unreasonable amount of time researching various issues. In an attempt to moot this issue, Slate states in his affidavit that he has voluntarily reduced by five percent the time accounted for in his time records for research, because he has "a tendency to strive for clarity, understanding, analysis and supportable legal precedent." While these attributes are certainly to be expected, they are not necessarily conterminous with reasonableness. Here, Slate's time entries indicate that he devoted an excessive amount of time researching straightforward areas of the law. As Slate is billing at the rate of $150 per hour for experienced attorneys, defendants will not be required to absorb the costs of Slate's

learning curve. Having reviewed all of Slate's entries for research, and taking into consideration the voluntary five percent reduction he has already made in the fee application, I find that it is proper to exclude 15 hours from the fee application due to excessive research.

Second, defendants contend that the roughly 110 hours Slate spent simply preparing questions for five depositions and reviewing the deposition transcripts is excessive. Upon reviewing the entries, I agree; thus, an additional 10 hours will be excluded from the lodestar calculation.

Third, and in similar vein, defendants assert that the 150 hours Slate spent on trial preparation is excessive. Again, I agree; thus, an additional 15 hours will be excluded from the lodestar calculation. *See Marshall*, 1998 WL 886967, at *4.

■ Fourth, defendants aver that Slate improperly billed a lawyer's rate for a number of essentially clerical tasks. It is axiomatic that an attorney may not bill a lawyer's rate for clerical tasks. *O'Grady v. Mohawk Finishing Products, Inc.*, 1999 WL 30988, *6 (N.D.N.Y. Jan.15, 1999); *Bridges v. Eastman Kodak Co.*, 1996 WL 47304, *7 (S.D.N.Y. Feb.6, 1996); *Loper v. New York City Policy Dep't*, 853 F.Supp. 716, 720 (S.D.N.Y.1994); *McKever v. Vondollen*, 681 F.Supp. 999, 1004 (N.D.N.Y. 1988); *Fiacco*, 663 F.Supp. at 746. Here, Slate spent approximately 10 hours faxing documents, filing the Complaint, collating exhibits, making telephone calls to schedule deposition dates and other events, and preparing subpoenas. As these tasks are routinely clerical in nature, Slate will be compensated for them at the prevailing rate of $50 per hour for paralegals and law clerks. *See, e.g., Serbalik*, 1999 WL 10971, at *3.

■ Lastly, defendants assert that an additional 15 percent across-the-board reduction is appropriate because plaintiffs' counsels' time records do not distinguish between plaintiffs' federal and state claims. This is significant, they assert, because plaintiffs should not be able to collect for fees relating to plaintiffs' state-law claims, which do not provide for attorney's fees. *See New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 67 n. 7, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980); *New York City Bd. of Educ. v. Sears*, 83 A.D.2d 959, 443 N.Y.S.2d 23, 25 (2d Dep't 1981).

In this case, each plaintiff succeeded on her Title VII and HRL claims against F & K supply. Thus, each is a "prevailing party" under 42 U.S.C. § 2000e–5(k). *See, e.g., Bridges v. Eastman Kodak*, 102 F.3d 56, 58 (2d Cir.1996). Defendants nonetheless seek a reduction for the time spent by plaintiffs' attorneys on the state-law claims. Although their argument is not without logical force, they cite not a single case to support their position. This is telling, as their assertion appears inconsistent with both the case law and the purposes behind permitting recovery of attorneys' fees under Title VII. *See Bridges*, 102 F.3d at 60 n. 2; *Zabkowicz v. West Bend Co., Div. of Dart Industries, Inc.*, 789 F.2d 540, 550–51 (7th Cir.1986); *Milwe v. Cavuoto*, 653 F.2d 80, 84 (2d Cir.1981); *see generally Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Accordingly, defendants' argument must fail.

I have considered defendants' remaining arguments and find them to be without merit.

### 2. Summary of Attorneys' Fees

In sum, then, applying the disallowances discussed above, the lodestar figure for Slate is as follows:

```
989.1 hours × $150 per hour = $148,365.00
10 hours (paralegal) × $50 per hour = $ 500.00
46.3 hours (travel) × $75 per hour = $ 3,472.50
```

The lodestar figures for Barrett and Resnick are accepted in the amounts of $17,408.00 and $14,754.00, respectively. Therefore, the total lodestar figure is $184,499.50.

■ Once the lodestar amount is calculated, there is a strong presumption that this figure constitutes a reasonable

amount. *See, e.g., City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). The burden falls on the party advocating an adjustment to justify that a change is necessary. *United States Football League v. National Football League,* 887 F.2d 408, 413 (2d Cir. 1989) (citing *Lindy Bros. Builders Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 118 (3d Cir.1976)).

Here, defendants do not argue for departure from the lodestar figure. Nor do I discern any reason to depart from that reasonable amount. Accordingly, plaintiffs are entitled to attorney's fees in the amount of $184,499.50.

### 3. Costs and Expenses

 The costs associated with litigation are generally recoverable if they are "reasonable out-of-pocket expenses incurred by the attorney and which are normally charged to fee-paying clients." *Reichman v. Bonsignore, Brignati & Mazzotta P.C.,* 818 F.2d 278, 283 (2d Cir.1987).

Here, plaintiffs seek to recover costs of $5,026.97, representing expenses for deposition transcripts, subpoenas, postage, the process server, photocopies, and filing fees. They are all properly recoverable. *See LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748, 763 (2d Cir.1998); *O'Grady,* 1999 WL 30988, at *8. Defendants also oppose none of them. Accordingly, plaintiffs are entitled to costs in the amount of $5,026.97.

### III. CONCLUSION

For the reasons stated above, defendants' motion for judgment as a matter of law is denied. Defendants' motion for a new trial is granted solely on the issue of compensatory damages for mental anguish unless each plaintiff accepts a remittitur of the mental anguish award to $30,000. Each plaintiff is to notify the Court and defendants in writing on or before March 29, 1999 of her election. Subject to each plaintiff's election to accept a remittitur, plaintiffs' motion for attorneys' fees and litigation expenses will be granted in the

amounts of $184,499.50 and $5,026.97, respectively. If either or both plaintiffs accept a remittitur, plaintiffs' counsel shall submit on notice on or before April 2, 1999 a proposed amended judgment setting forth plaintiffs' recovery against defendants under the claims and in the damage amounts as provided herein. In the event that either plaintiff declines a remittitur, the Clerk shall vacate the judgment in favor of her and against F & K Supply and Aaron for compensatory damages for mental anguish, and the Clerk shall schedule a new trial on the issue of damages for mental anguish only.

**IT IS SO ORDERED.**